771 N.W.2d 185 (2009)
17 Neb. App. 752
In re Guardianship of ELIZABETH H., a minor.
Beth R., appellant,
v.
Thomas H. and Susan H., appellees.
No. A-08-830.
Court of Appeals of Nebraska.
July 14, 2009.
*188 Sandra Stern, Omaha, for appellant.
C.G. (Dooley) Jolly, of Forsberg & Jolly Law, P.C., L.L.O., for appellees.
IRWIN, CARLSON, and MOORE, Judges.
MOORE, Judge.

INTRODUCTION
Thomas H. and Susan H. filed a petition for guardianship of their granddaughter, Elizabeth H. Elizabeth's natural mother, Beth R., objected to the guardianship. Following a trial, the Douglas County Court found Beth to be unfit and granted the amended petition for guardianship. Beth now appeals, and for the reasons set forth herein, we affirm.

BACKGROUND
Thomas and Susan filed this action to establish guardianship of their granddaughter, Elizabeth. Thomas and Susan's daughter and Elizabeth's natural mother is Beth. Elizabeth's father was incarcerated at the time of the hearing on this matter, but received notice and appeared telephonically for some of the proceedings. Elizabeth was born in April 2002, and Beth thereafter gave birth to three sons, born in April 2005, May 2006, and January 2008.
On January 22, 2008, Thomas and Susan filed a petition for guardianship of Elizabeth alleging that both Beth and Elizabeth's father were unable or unwilling to provide the requisite care and supervision that Elizabeth required. They also asked the court to appoint a temporary guardian, pending notice and hearing on permanent guardianship, asserting that Beth had abandoned Elizabeth and that Elizabeth's father was incarcerated. On February 26, the county court issued letters of temporary coguardianship to Thomas and Susan, and they filed acceptances the same day.
On March 7, 2008, Beth filed an answer to the petition for guardianship, stating that she was willing, able, and competent *189 to care for Elizabeth, had not abandoned her, and had requested Elizabeth's return on numerous occasions. Beth asked the court to deny the guardianship and order Elizabeth to be returned to her.
On April 15, 2008, Beth moved to set aside the temporary guardianship. A hearing on that motion was held on May 21. The record does not reflect that the court explicitly ruled on the motion, but in an order dated May 21, 2008, the court ordered a permanent guardianship hearing and therefore implicitly denied it. The order also allowed visitation, but set forth no specific visitation requirements.
On May 21, 2008, Thomas and Susan filed an amended petition for guardianship, which the court heard on June 30. Thomas and Susan called five witnesses to testify: Beth; Susan; Thomas; Sonya R., who is Beth's former mother-in-law; and an employee at the daycare that Elizabeth attended in 2004. Beth testified in her own behalf and called two additional witnesses: a family support worker and visitation specialist, who had observed her recent visits with Elizabeth, and a family friend.
Beth was 24 years old at the time of the trial and has four childrenElizabeth, who was then 6 years old, and three sons who were then 3 years old, 2 years old, and 5 months old. Each of the four children has a different father. Beth was in a relationship with Elizabeth's father for approximately 2 or 3 weeks. He was incarcerated for attempted murder at the time of the trial. Beth had had some contact with him since Elizabeth's birth; she had sent him pictures of her children, and he had sent her letters, although she rarely ever sent a letter back to him.
After Elizabeth was born, Beth lived with her parents until Elizabeth was 2 or 2½ years old. While they were living with Thomas and Susan, Beth worked and Elizabeth went to daycare during Beth's work hours. Susan testified that for the first year of Elizabeth's life, Beth was a good mother, but then she became more interested in "doing things" with her friends. Susan said Beth also took Elizabeth to daycare when Beth had the day off from work instead of spending time with her. Susan described the upstairs portion of the house where Beth lived with Elizabeth as "shocking" and stated that there were soiled diapers on the floor in all of the rooms, the crib sheet was so dirty that it was stiff, and there were several old bottles "all over the floor."
In approximately January 2004, Beth moved out of Thomas and Susan's home and she and Elizabeth moved in with a man, with whom Beth lived for approximately 4 or 5 months. During her deposition, Beth was unable to remember the man's last name. Beth took Elizabeth to live with Thomas and Susan on March 7. Susan testified that Beth contacted her and Thomas and asked if Elizabeth could stay with them while she got back on her feet. Beth acknowledged that she "wasn't in a good spot for a long time." Elizabeth has not returned to live with Beth, and Beth has not returned to live at Thomas and Susan's home with Elizabeth since that time.
During the first few weeks that Elizabeth lived with Thomas and Susan, they kept Elizabeth during the week and Beth picked her up from daycare on Friday afternoon, kept her over the weekend, and returned her on Sunday afternoon. Susan stated that they suggested that arrangement because Beth was partying and they did not want to give her free rein, because they felt she needed to take time to take care of her child.
On March 21, 2004, after a weekend visit, Beth returned Elizabeth with an injury, *190 which Susan and Beth both described as a burn, to her nose and upper lip. A photograph of the injury appears in the record. Beth testified that Elizabeth received the injury while visiting Elizabeth's father. Beth testified that she dropped Elizabeth off with Elizabeth's father for an hour and that when she returned to pick her up, she had the injury. Beth also testified that she took Elizabeth to get medical treatment, paid for the medical appointment, and filed a police report regarding the incident. Susan testified, however, that when she asked Beth how the injury occurred, Beth responded that she was in the next room for a couple of hours and that when she came out, Elizabeth's nose was burned. Susan also said Beth told her that she took Elizabeth to the emergency room, but that she was told they would not treat Elizabeth because Beth could not tell them how Elizabeth sustained the injury. Elizabeth has not seen her father since the injury.
On March 24, 2004, following the injury, Susan suggested to Beth that Susan and Thomas keep Elizabeth full time so Elizabeth would have more stability. Beth quickly agreed. Susan recalled that Beth did not see Elizabeth for 6 months after that. Beth called once during that timeframe to visit, but because it was going to be late in the evening, Susan suggested that Beth come when she had a day off. Susan testified that Beth knew where Elizabeth was living with Thomas and Susan, their telephone number had not changed, they did not attempt to hide Elizabeth or interfere in the mother-daughter relationship, and they never indicated that Beth was not welcome in their home.
Beth was convicted of driving under the influence in 2005. In April 2005, Beth gave birth to a son. In May 2006, she gave birth to another son. Beth married Nick R., that son's father, in July 2005. The couple separated in July 2006 and divorced thereafter. While they were married, Beth filed a petition for a protection order against Nick and assault charges were also filed against him. Beth stated that during the time she was married, she was in a position to take Elizabeth back. She stated that she prepared a room for Elizabeth and was saving to buy clothes for her. Beth requested that Thomas and Susan return Elizabeth to her in April 2006 while she was still married, but reunification did not occur. Susan testified that she and Thomas encouraged Beth to establish a relationship with Elizabeth before she took her back because they were essentially strangers to one another at that time. However, Beth did not follow up by spending time with Elizabeth. Beth's request in April 2006 was the only instance in which Beth asked Thomas and Susan to return Elizabeth, aside from the present case.
Sonya, Nick's mother, testified regarding a home where Nick and Beth lived with Beth's two older sons during their marriage. This was the same home to which Beth testified she made preparations to bring Elizabeth to live with her. Sonya testified that the home was a mess with clutter and that there were numerous broken beer bottles on the step and in the driveway. At one point, Beth left her two older sons with Sonya for a period of less than 2 weeks. During that time, Nick was in jail and Beth spent time in the hospital because Nick had abused her. In August 2006, Beth moved out of the house she shared with Nick and moved into an apartment with her two older sons.
In February or March 2007, Beth moved in with her current boyfriend, Mike M., who was then 45 years old. A son was born to Mike and Beth in January 2008. Beth was still living at that residence at the time of the hearing. The household *191 includes eight people: Mike, Beth, Beth's three sons, and Mike's two children and grandson. Mike was recently charged with criminally assaulting Nick. Beth testified that Mike fully supports her and her children and that she is a stay-at-home mother who does not work outside of the home. She acknowledged that if she and Mike were to separate, she was unsure where she would live, but testified that she had friends with whom she could stay.
For Easter in April 2007, Beth, Mike, and the two older sons visited Elizabeth at Thomas and Susan's home. They took two stuffed animals to Elizabeth. Susan recalled that Beth took several pictures of herself with Elizabeth and of Elizabeth with her half brothers and that because this had never happened before, it confused Elizabeth. Susan stated that at that time, she did not know where Beth was living and did not have her telephone number. Beth acknowledged that she did not give Thomas and Susan her telephone number for a period of time, but stated that she did give them Mike's telephone number.
Susan testified that in her opinion, Beth had abandoned Elizabeth. She reasoned that during the past 4 years, Beth had seen Elizabeth less than a dozen times. Prior to Beth's visits resulting from the present guardianship case, which are discussed below, it had been approximately 14 months since Beth had had any contact with Elizabeth. Beth acknowledged that the only contact, including telephone calls, she had had with Elizabeth in the year prior to the hearing was the Easter 2007 visit. Susan testified that over the years, Beth did make a couple of calls, had once asked to take Elizabeth to a zoo, and had taken her to see the movie "Cars." Susan recalled that Beth would give only about an hour's notice of her request to see Elizabeth, while Beth said that she usually tried to give notice the day before she wanted to visit. Beth admitted that she should have called Elizabeth more often.
Beth did not contribute financially to Elizabeth's upbringing. Although she was ordered to pay child support for Elizabeth on February 14, 2008, Beth did not make any child support payments until a couple of weeks prior to the June 30 hearing. Susan testified that she and Thomas carry health insurance on Elizabeth, pay for her school tuition, and receive $222 per month in "ADC" for Elizabeth.
Beth did not know who Elizabeth's first grade teacher was and admitted that she did not attend parent-teacher conferences for Elizabeth during the previous year and did not make an effort to find out when they were held. Beth stated that she did not send any gifts for Elizabeth to Thomas and Susan's house and acknowledged that the only gift she had given Elizabeth in the previous year was a stuffed animal for Easter in 2007.
Beth stated that she did not simply take Elizabeth from Thomas and Susan, her parents, because she did not want to scare Elizabeth. She also stated that she had a tense relationship with her parents and was uncomfortable confronting them regarding visitation and taking Elizabeth back. Beth stated that "every time I did try to get [into] contact with them over the years, it just seem[ed] like there [were] all kinds of excuses.... I don't have a relationship with them, so it's hard for me to go and be with them just to see my daughter." Beth acknowledged that Thomas and Susan had taken good care of Elizabeth but stated that she opposed the guardianship because she was capable of taking care of her. She also acknowledged that Elizabeth had a stronger bond with Beth's parents because Beth had not spent as much time with Elizabeth. When asked why she wanted her daughter back now, *192 Beth stated, "I just kind of think every child should be with their mother. I have friends that work in places like Boys Town andwith kids like that, and I just heard some real nasty stories, and II don't want my kids to turn out like that."
A family support worker and visitation specialist testified on Beth's behalf. The worker supervised the six 2-hour vis-its between Elizabeth and Beth from June 11 to 27, 2008, just prior to the hearing. She testified that the visits occurred at a zoo, a park, Beth's home, a skating rink, a restaurant, and a children's museum. The worker was not concerned for Elizabeth's safety during the visits that she observed. She testified that Elizabeth and Beth appeared to have a regular mother-daughter relationship and that she observed normal interaction between Elizabeth and her half siblings.
Beth's family friend testified that she and Beth had been friends for approximately 3 years and that she had observed Beth and Mike with Beth's sons, but not with Elizabeth. She stated that she spent time with the family about one or two times per week and that they were a typical family. She testified that they had steady meals, a clean home, clean clothes, and a roof over their heads and that the children had consistent bed-times. She stated that Beth told her that she intended to bring Elizabeth back into her life and into her home.
Following the testimony at the hearing, the county judge ruled from the bench, finding that Beth was unfit, and awarded permanent guardianship to Thomas and Susan. On July 1, 2008, the county court entered a written order finding that Beth was unfit to have the care, custody, and control of Elizabeth; granted Thomas and Susan's amended petition for guardianship; and ordered letters of guardianship to be issued. Beth now appeals.

ASSIGNMENT OF ERROR
Beth asserts, restated, that the county court erred when it appointed Thomas and Susan as coguardians of Elizabeth over her objection because there was not competent, clear, and convincing evidence that Beth was unfit or that she had forfeited her rights.

STANDARD OF REVIEW
[1-3] Appeals of matters arising under the Nebraska Probate Code are reviewed for error on the record. See, In re Guardianship of D.J., 268 Neb. 239, 682 N.W.2d 238 (2004); Neb.Rev.Stat. §§ 30-2201 through 30-2902 (Reissue 2008). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. In re Guardianship of D.J., supra. An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings. In re Guardianship of Cameron D., 14 Neb.App. 276, 706 N.W.2d 586 (2005).
[4] On questions of law, an appellate court has an obligation to reach its own conclusions independent of those reached by the lower courts. In re Guardianship of Lavone M., 9 Neb.App. 245, 610 N.W.2d 29 (2000).

ANALYSIS
Beth asserts that the county court erred when it appointed Thomas and Susan as coguardians of Elizabeth over Beth's objection because there was not competent, clear, and convincing evidence that Beth was unfit or that she had forfeited her rights to Elizabeth.
*193 Section 30-2608 provides, in relevant part:
(a) The father and mother are the natural guardians of their minor children and are duly entitled to their custody... being themselves ... not otherwise unsuitable....
. . . .
(d) The court may appoint a guardian for a minor if all parental rights of custody have been terminated or suspended by prior or current circumstances or prior court order.
Further, § 30-2611(b) provides in part:
Upon hearing, if the court finds that a qualified person seeks appointment, venue is proper, the required notices have been given, the requirements of section 30-2608 have been met, and the welfare and best interests of the minor will be served by the requested appointment, it shall make the appointment.
[5-8] A guardianship is no more than a temporary custody arrangement established for the well-being of a child. In re Guardianship of D.J., 268 Neb. 239, 682 N.W.2d 238 (2004). The appointment of a guardian is not a de facto termination of parental rights, which results in a final and complete severance of the child from the parent and removes the entire bundle of parental rights. Rather, guardianships give parents an opportunity to temporarily relieve themselves of the burdens involved in raising a child, thereby enabling parents to take those steps necessary to better their situation so they can resume custody of their child in the future. Id. Granting one legal custody of a child confers neither parenthood nor adoption; a guardian is subject to removal at any time. In re Guardianship of Zyla, 251 Neb. 163, 555 N.W.2d 768 (1996). In that sense, guardianships are temporary and depend upon the circumstances existing at the time. Id.
[9-12] The Nebraska Supreme Court held in In re Guardianship of D.J., supra, that the parental preference principle applies in guardianship proceedings that affect child custody. The parental preference principle establishes a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent. Id. The principle provides that a parent has a natural right to the custody of his or her child which trumps the interest of strangers to the parent-child relationship and the preferences of the child. Id. An individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent either is unfit or has forfeited his or her right to custody. Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent. Id.
[13-15] Our research reveals no Nebraska case law involving the application of the parental preference principle to the initial appointment of a guardian as opposed to a guardianship termination proceeding. However, it is axiomatic that the parental preference principle must also be applied to initially determine whether to appoint a guardian over a parent's objection. It follows that an individual who seeks appointment as a guardian over the objection of a biological or adoptive parent bears the burden of proving by clear and convincing evidence that the biological or adoptive parent is unfit or has forfeited his or her right to custody. Absent such proof, the constitutional dimensions of the relationship between parent and child require a court to deny the request for a guardianship. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation *194 in child rearing and which has caused, or probably will result in, detriment to a child's well-being. In re Guardianship of Cameron D., 14 Neb.App. 276, 706 N.W.2d 586 (2005). The "fitness" standard applied in guardianship appointment under § 30-2608 is analogous to a juvenile court finding that it would be contrary to a juvenile's welfare to return home. See In re Guardianship of Rebecca B. et al., 260 Neb. 922, 621 N.W.2d 289 (2000).
[16, 17] We now apply the law to the facts of the present case to determine whether Thomas and Susan have proved by clear and convincing evidence that Beth is unfit or has forfeited her right to custody of Elizabeth. The county court found only that Beth was unfit and did not determine whether she had forfeited her right to custody of Elizabeth, and as such, we limit our review to the issue of whether Beth is unfit to retain custody of Elizabeth. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. In re Interest of Ty M. & Devon M., 265 Neb. 150, 655 N.W.2d 672 (2003). We review for error on the record the county court's decision to appoint Thomas and Susan as Elizabeth's coguardians. That is, we consider whether the court's decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable. We do not substitute our factual findings for those of the county court where competent evidence supports those findings.
At the trial, the county court judge stated that the main issue in this case was whether Beth was a fit person to have the custody of her daughter, Elizabeth. The court then made oral factual findings before announcing its determination that Beth was unfit. The court noted that Beth had shown she was deficient at making proper choices in her life and that those choices had a negative effect on Elizabeth's well-being. The court stated:
Now a part of being a fit parent is making proper choices, or at leas[t] not making bad ones.... Having children you can't take care of financially or emotionally is not a proper choice. When you do this continually, it indicates that you are not a person who can make proper choices. Choosing mates who are going to be responsible for the care and custody of these children, along with you as their parent, is also something that is indicative of whether or not you make proper choices.... Choosing somebody who assaults you repeatedly [or] somebody who's put in jail for attempted murder is not making proper choices....
Now, this doesn't seem to bother you at all, but it certainly bothers me. You have absolutely had no stability in your relationships with the men. In fact, you've also indicated the men that you have had sex with and had children with, some of [them] you don't even hardly know.... You have no ... connection with these people. You just go have babies. Those are not proper choices. You are unemployed.... Your newest boyfriend [was] just recently convicted of assaulting your ex-husband [and that] doesn't indicate a very good choice. If you leave your current boyfriend, you have no visible means of support.... These are not proper choices for somebody who wants to be a fit parent to a child.
Now, there's more than ample evidence that you have had minimal, and I mean minimal, contact with this little girl for the last four years. Now that's a lot of time.... [W]hen events [occur] so occasionally that you can remember them vividly, like taking her to the movie *195 Cars[,][t]hey happen so sporadically that they can't be termed as anything but momentous because they very seldom ever happen. Those are things you shouldn't be able to remember at all because you do them so often they just blur together. But now these are the things that I'm supposed to take and find that you are a fit parent.
[F]rom the evidence, I believe the outcome is absolutely clear. By your own actions or the lack thereof, it is clear to me that you were and still are unfit to have custody of Elizabeth.... It's clear that you were not able to care for Elizabeth financially or emotionally many years ago. And you made the choice to have more children that you can't financial[ly] take care [of]; with three other men, all out of wedlock.... I think you are unfit to have the custody of the child and if you ever wish to have custody of her, you're going to have to do a[n] awful lot of changing as far as I'm concerned.
Because the court ultimately appointed Thomas and Susan as Elizabeth's permanent coguardians, it implicitly determined that the requirements of § 30-2611(b) had been met, including that Elizabeth's welfare and best interests would be served by granting the requested appointment.
The record before us provides competent evidence to support the court's determination that Beth was unfit to retain custody of Elizabeth at the time of the hearing. Beth has shown a pattern of poor decisionmaking which has been and probably would be detrimental to Elizabeth's well-being if Elizabeth were to live with Beth at this time. Beth has made many choices that have adversely affected her relationship with Elizabeth. Beth has had very minimal contact with Elizabeth in the 4 years that Elizabeth has lived with Thomas and Susan. Beth admitted that she should have called more often and that she did not see Elizabeth for extended periods of time. The only explanation that Beth has given for her absence from Elizabeth's life is that it was difficult for her to be around her parents "just to see [her] daughter." Beth's decision to forgo a relationship with Elizabeth so that she could avoid her parents is an example of Beth's unwillingness to put her parental responsibilities before her own interests, and it also indicates an indifference toward her child's welfare over a long period of time, which is undoubtedly a detriment to Elizabeth's well-being.
Beth's history over the last 4 years has certainly shown a lack of stability and maturity. Beth's present situation is that she is unemployed and lives in a three-bedroom home with her boyfriend, his two children and grandson, and Beth's three sons. It is unclear how Elizabeth would fit into this scenario. The evidence shows that Elizabeth is confused over Beth's present family situation. We are mindful that we are not to consider that Thomas and Susan may provide a more economically advantageous home situation to Elizabeth. See In re Interest of Amber G. et al., 250 Neb. 973, 554 N.W.2d 142 (1996). We also note that there is no evidence to suggest that Beth has not been a fit parent to her three younger sons.
We conclude that at the time of the hearing, the evidence clearly and convincingly supported a finding that placing Elizabeth with Beth would result in detriment to Elizabeth and would be contrary to her welfare. This conclusion is primarily supported by the fact that Beth has not had a parental relationship with Elizabeth until shortly before the hearing. However, recognizing the temporary nature of guardianships, this is not to say that Beth could not place herself in a position in the future to regain custody of Elizabeth *196 after a satisfactory period of regular visitation and establishment of a parental relationship, together with a showing of stability in Beth's life.
We find that the county court's decision conforms to the law, is supported by competent evidence, and is not arbitrary, capricious, or unreasonable. As such, we find that the county court did not err when it found that Beth was unfit and granted the amended petition for guardianship.

CONCLUSION
For the aforementioned reasons, we find that the county court did not err when it granted the amended petition for guardianship, and accordingly, we affirm.
AFFIRMED.