IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**


IN RE INTEREST OF MAYKALA P.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF MAYKALA P., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
PAUL P., APPELLANT.


Filed November 10, 2014.    No. A-14-264.


Appeal from the Separate Juvenile Court of Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

D.A. Drouillard, of Drouillard Law, P.C., for appellant.

Donald W. Kleine, Douglas County Attorney, and Erin Hurley for appellee.

Mallory N. Hughes, of Dornan, Lustgarten & Troia, P.C., L.L.O., guardian ad litem.


IRWIN, INBODY, and PIRTLE, Judges.

PIRTLE, Judge.

INTRODUCTION

Paul P. appeals from two orders of the separate juvenile court of Douglas County. The first order denied Paul's request to have his daughter, Maykala P., placed in his care and held that she was to remain in the temporary custody of the Nebraska Department of Health and Human Services (Department). The second order continued Maykala's detention with the Department pending adjudication. Paul contends that the juvenile court erred in its application of the parental preference doctrine, thereby denying placement of Maykala with him, and in continuing detention of Maykala pending adjudication. Based on the reasons that follow, we affirm.

- 1 -

BACKGROUND

On July 24, 2013, the State filed a petition alleging that Maykala came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults and habits of her mother. Maykala was removed from her mother's care and placed in the custody of the Department. On November 19, Paul filed a complaint to intervene as the biological father of Maykala. In the complaint, he sought placement of Maykala in his home during the pendency of the case. A hearing was held and there was no objection to the complaint to intervene, but Maykala's mother and her guardian ad litem (GAL) objected to Maykala's being placed with Paul. Paul's counsel clarified that he was not asking that Maykala be placed with Paul that day, but, rather, he was asking the court to order a plan to transition Maykala from her current placement into Paul's home.

On January 24, 2014, following the hearing, the juvenile court granted Paul leave to intervene. The court noted in its order that Maykala's mother and GAL objected to placement of Maykala with Paul, but said nothing further about placement.

On February 19, 2014, the Department filed a notice for change of placement for Maykala to place her in the same foster home as her younger half sister. On February 21, Paul filed an objection to the change of placement and a motion to stay, requesting that Maykala be placed in his home and not in a new foster placement as proposed by the Department.

A hearing was held on March 10, 2014, on Paul's objection to the change of placement and motion to stay. Paul argued at the hearing that he was seeking placement of Maykala with him. The State, the GAL, and Maykala's mother all objected to having Maykala placed with Paul.

Megan Kenealy, a family permanency specialist with Nebraska Families Collaborative (NFC) and Maykala's caseworker since August 2013, was called to testify by the State. She testified that she met Paul for the first time in July 2013, but her contact with him since that time had been very limited. Kenealy testified that she arranged for visitation between Maykala and Paul, which initially occurred three times per week and was supervised. Kenealy testified that prior to her setting up the visits, Paul had not had contact with Maykala for a least 1 year. Kenealy stated that 2 months prior to the March 10, 2014, hearing, Paul's supervised visits were reduced to two times per week in part because of concerns Maykala expressed about the visits to Kenealy and her therapist, Amanda Gurock. Kenealy stated that Maykala's concerns were also documented in the visitation reports. The concerns regarding visitation included the following: Paul's arguing with Maykala at visits, which required redirection by the visitation worker on multiple occasions; Paul's using profanity or cursing during visits; and Paul's failing to attend all visits and arriving late to visits. One of the issues Paul argued with Maykala about is whether she was going to live with him in the future, and on at least one occasion, Maykala told Paul she did not want to live with him and Paul continued to argue with her about her placement. Kenealy testified that Maykala has told her that she does not want to live with Paul and that she had negative memories of him being abusive to her mother. She specifically recalled that at her third birthday party, there was an altercation between Paul and her mother during which Paul spit in her mother's face and was verbally aggressive toward her mother. Maykala did not report any other specific instances of domestic abuse to Kenealy.

Kenealy testified that she received a letter from Gurock recommending that Paul's visits with Maykala be changed from supervised to therapeutic based on concerns expressed by Maykala during therapy, which included feeling uncomfortable during visits with Paul and not wanting to live with Paul.

Kenealy testified that Paul was living with his parents so NFC ran a background check on them, which revealed that Paul's mother was on the "central registry" based on several intakes in the past for child abuse and neglect. Kenealy testified that NFC has a policy that it does not recommend placement in a home where someone who lives there is listed on the central registry. Kenealy testified that since Maykala could not be placed in Paul's current home, she offered Paul assistance in finding alternate housing. However, Paul refused her offer to work with a subsidized housing program through the State and indicated he wanted to continue living with his parents. Paul was also provided access to a program to assist with finding employment, as well as a family support worker to assist with housing, both of which he declined.

Kenealy testified that she believed there was a lack of bond between Maykala and Paul. She expressed this concern to Paul, and he denied needing any outside help. Kenealy also specifically recommended family therapy to Paul so he could work on his relationship with Maykala, but Paul did not agree to it at that time and said he would think about it.

Kenealy testified that other than attending supervised visits, Paul had not shown any initiative to utilize services recommended and made available to him. Kenealy testified that in her opinion Maykala would be at risk for harm if she were placed with Paul.

In an order dated March 11, 2014, the juvenile court denied Paul's objection to change of placement and his motion to stay. The court found that Maykala would remain in the temporary custody of the Department with placement to exclude Paul's home because it would be contrary to Maykala's best interests to be placed in Paul's home.

On March 11, 2014, the State filed a third supplemental petition alleging that Maykala came within the meaning of § 43-247(3)(a) due to the faults or habits of Paul. The State also filed a motion for immediate temporary custody for the Department to maintain custody of Maykala for appropriate placement to exclude Paul's home, which the court granted.

A protective custody hearing in regard to the third supplemental petition was held on March 13, 2014. The State offered and the court received into evidence an affidavit of Kenealy and an affidavit of Gurock. The court also took judicial notice of the court's March 11 order denying Paul's objection to the change of placement and motion to stay.

Following the protective custody hearing, the court entered an order on March 14, 2014, finding that there was probable cause that Maykala came within the meaning of § 43-247(3)(a) in regard to Paul. It further found that reasonable efforts were provided to Paul on a voluntary basis to finalize permanency and/or return Maykala to the parental home, but it would be contrary to Maykala's health and safety to be returned to Paul's home, and that it is in the best interests of Maykala to remain in the temporary custody of the Department with placement to exclude Paul's home.

## ASSIGNMENTS OF ERROR

Paul assigns that the juvenile court erred in (1) its application of the parental preference doctrine, thereby denying placement of Maykala with him during the pendency of this case, and (2) continuing detention of Maykala pending adjudication.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

Paul first assigns that the juvenile court erred in its application of the parental preference doctrine to the facts of this case and, consequently, in denying placement of Maykala with him during the pendency of this case. He specifically contends that the evidence presented at the March 10, 2014, hearing on his objection to the change of placement and motion to stay was insufficient to prove that Paul is an unfit parent.

The parental preference principle establishes a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent. *In re Guardianship of Elizabeth H.*, 17 Neb. App. 752, 771 N.W.2d 185 (2009). The principle provides that a parent has a natural right to the custody of his or her child which trumps the interest of strangers to the parent-child relationship and the preferences of the child. *Id.* Courts may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011). Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

We conclude that the evidence presented at the March 10, 2014, hearing was sufficient to overcome the presumption that it was in Maykala's best interests to be placed with Paul. Kenealy testified that she initially met Paul in July 2013, after Maykala was removed from her mother's care. After Kenealy's initial meeting with Paul, her contact with him was very limited. In July, Kenealy helped Paul establish visits with Maykala. Prior to those visits being set up, Paul had not seen Maykala for at least 1 year. The visits that Kenealy helped arrange were supervised due to the lack of contact between Paul and Maykala in the past, and occurred three times per week. Kenealy testified that about 2 months before the hearing at issue, Paul's visits were decreased to two visits per week based on concerns noted in visitation reports and concerns expressed by Maykala to both Kenealy and Gurock. The concerns included Paul's arguing with Maykala, which required redirection by the visitation worker, as well as Paul's using profanity or cursing during visits. Paul argued with Maykala about whether she would live with him. On at least one occasion, Maykala told Paul that she did not want to live with him and he continued to argue

with Maykala about her placement. Paul also arrived late to several visits and failed to attend some visits.

Maykala also remembers at least one altercation between Paul and her mother, which occurred at her third birthday party. She recalled that Paul spat in her mother's face and was verbally aggressive toward her mother.

Based on the concerns revealed by Maykala in therapy, Gurock wrote a letter to Kenealy requesting that visits between Paul and Maykala become therapeutic, rather than supervised.

There was also evidence that Maykala could not be placed with Paul at the time because he was living with his parents and his mother was on the central registry due to past intakes of child abuse and neglect. Kenealy testified that she offered Paul assistance in finding alternate housing. However, Paul refused to work with a subsidized housing program through the State. Paul was also offered access to a program to assist with finding employment, as well as a family support worker to assist with housing, both of which he declined. The evidence at the hearing further showed that Paul did not accept services offered by Kenealy to help establish a bond with Maykala, as he did not believe he needed any help. Kenealy testified that based on the above concerns, Maykala would be at risk for harm if she were placed with Paul.

Paul's actions and inactions as discussed above are relevant to his fitness as a parent and whether or not it would be in Maykala's best interests to be placed with him. Based on our de novo review and considering the totality of the evidence presented, there was sufficient evidence to rebut the presumption under the parental preference doctrine that Paul was a fit and proper parent at the time. The juvenile court properly concluded following the March 10, 2014, hearing that placing Maykala with Paul would be contrary to her best interests, and it did not err in failing to place Maykala with Paul.

Paul next assigns that the juvenile court erred in continuing detention of Maykala outside of his home pending adjudication. This assignment of error is based on the court's March 14, 2014, order entered after the protective custody hearing. The court found that reasonable efforts were provided to Paul on a voluntary basis to finalize permanency and/or return Maykala to the parental home and that it would be contrary to Maykala's health and safety to be returned to the parental home. The court further found that it was in Maykala's best interests to remain in the temporary custody of the Department with placement to exclude Paul's home.

Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998). At a detention hearing, the State must prove by a preponderance of the evidence that the custody of a juvenile should remain in the Department pending adjudication. *In re Interest of Cherita W.*, 4 Neb. App. 287, 541 N.W.2d 677 (1996); Neb. Rev. Stat. § 43-254 (Supp. 2013). The State is not required to establish a specific harm or risk to the juvenile; it is enough if the evidence establishes by a preponderance of the evidence that the conduct or circumstances of the parent or custodian are such that it is contrary to the juvenile's welfare to remain in, or return to, the parental or custodial home. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). Pursuant to § 43-254, if a juvenile has been removed pursuant to Neb. Rev. Stat. § 43-248(2) (Supp. 2013), the juvenile court may enter an order continuing detention or placement upon a written determination that continuation of the

juvenile in his or her home would be contrary to the health, safety, or welfare of such juvenile and that reasonable efforts were made to preserve and reunify the family if required under Neb. Rev. Stat. § 43-283.01(1) through (4) (Cum. Supp. 2012).

In regard to reasonable efforts, the juvenile court found that such efforts included family time, therapy for Maykala, a background check on Paul's residence, an NFC investigation and interviews, assistance with income and housing, parenting classes, a bonding assessment, and family therapy. The evidence presented at the protective custody hearing supports the court's finding that these reasonable efforts were made to reunify Paul and Maykala. Kenealy stated in her affidavit that she offered to help Paul find alternate housing after she informed him that Maykala could not be placed in the same home as his mother, whom Paul was living with. Despite knowing that placement would not occur if he lived in the same home as his mother, Paul indicated to Kenealy that he wanted to continue living with his parents and did not intend on moving. Kenealy's affidavit also states that she offered Paul the services of a family support worker to assist him with finding employment and housing, but Paul refused to work with a family support worker. Kenealy's affidavit also states that she recommended parenting classes, which Paul said he did not need. Kenealy stated that Gurock had recommended a bonding assessment, which Paul did not feel was necessary. Kenealy also offered to get Paul involved in family therapy and told him it was recommended by NFC and Gurock. He initially refused, and then stated he would consider it; however, as of March 7, 2014, he had not agreed to take part in family therapy. The evidence presented at the protective custody hearing was sufficient to demonstrate that reasonable efforts were made to preserve and reunify the family.

Paul also argues that the evidence at the protective custody hearing does not support the juvenile court's finding that placement of Maykala with him would be contrary to her health and safety. Based on our de novo review, we find that the evidence at the protective custody hearing was sufficient to support this finding. Most notably, the evidence showed that Paul does not have appropriate housing for Maykala. As previously discussed, Paul lives with his parents and his mother is not approved to live in the same house with Maykala. In addition, Paul had a limited relationship, if any, with Maykala before this case was initiated. Kenealy's affidavit states that according to Maykala's mother, Paul did not see Maykala between March 2010 and October 2012. Maykala was only 6 years old at the time of the protective custody hearing.

Further, the affidavits of Kenealy and Gurock set out the concerns at visits, including Paul's arguing with Maykala and swearing or making inappropriate statements. The evidence also showed that Maykala has memories of Paul's abusing her mother.

The evidence showed by a preponderance of the evidence that continued detention of Maykala was necessary for her health, safety, and welfare, and that reasonable efforts had been made by the State to reunify and preserve the family as required by § 43-283.01. The juvenile court did not err in continuing Maykala's detention with the Department pending adjudication.

CONCLUSION

We conclude that the juvenile court did not err in applying the parental preference doctrine, thereby denying placement of Maykala with Paul in its March 11, 2014, order. We

further conclude that the juvenile court did not err in continuing Maykala's detention with the Department pending adjudication in its March 14, 2014, order.

AFFIRMED.