IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE GUARDIANSHIP OF JORDAN M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP OF JORDAN M., A MINOR CHILD.

KAAREN H., GUARDIAN, APPELLEE,
V.
MATTICE M., APPELLANT.

Filed December 30, 2014.    No. A-13-938.

Appeal from the County Court for Douglas County: EDNA ATKINS, Judge. Affirmed.

Nathaniel V. Romano, Martha J. Lemar, and James P. McGarvey and Carlton Wiggam, Senior Certified Law Students, of Milton R. Abrahams Legal Clinic, for appellant.

Karen S. Nelson, of Schirber & Wagner, L.L.P., for appellee.

IRWIN, INBODY, and PIRTLE, Judges.

PER CURIAM.

## I. INTRODUCTION

Mattice M. filed a petition in county court seeking to terminate Kaaren H.'s guardianship of Mattice's daughter, Jordan M. Ultimately, the court denied Mattice's request and ordered that the guardianship continue. Mattice appeals from the court's decision here. Upon our review of the record, we conclude that the denial of Mattice's request to terminate the guardianship was supported by clear and convincing evidence. As such, we affirm the decision of the county court.

## II. BACKGROUND

Mattice is the biological mother of Jordan, born in October 2010. Jordan's biological father, Jacob W., has been incarcerated for a majority of Jordan's life. He has not ever objected to the guardianship of Jordan. As such, he is not a party to these proceedings. Kaaren is Jacob's mother and, as a result, is Jordan's paternal grandmother.

Sometime in 2011, after Mattice was convicted of hindering the apprehension of a fugitive from justice and incarcerated in Texas, Kaaren filed a petition in the county court requesting that she be appointed the temporary and permanent guardian for Jordan, who was then not even 1 year old. Mattice objected to Kaaren's petition.

In June and November 2011, the county court held hearings to address Kaaren's request to serve as Jordan's permanent guardian. In December 2011, the court entered an order appointing Kaaren as Jordan's permanent guardian. The court indicated that its decision was based on evidence that Jordan would be in danger if she were allowed to remain in Mattice's custody, including evidence that Mattice was a convicted felon, on probation for the next 5 years, as a result of her involvement with an escaped felon; that Mattice had failed to protect Jordan from secondhand smoke, which had seriously exacerbated Jordan's asthma; that Mattice was living at a homeless shelter and remained unemployed; and that Mattice did not have a family support system to provide assistance. The court concluded that Mattice lacked the capacity to parent Jordan and that her right to custody of Jordan had been suspended by circumstances.

Mattice appealed from the county court's order appointing Kaaren as Jordan's permanent guardian. In *In re Guardianship of Jordan M.*, 20 Neb. App. 172, 820 N.W.2d 654 (2012), this court affirmed the county court's decision. Specifically, we found:

> [T]he evidence presented at trial demonstrates that because of Mattice's decision to involve herself with a convicted felon, she is currently unable to provide Jordan with a stable home environment. In addition, the evidence demonstrates that Mattice has repeatedly placed Jordan in dangerous situations, without regard for her safety or physical well-being. Essentially, the evidence reveals that Mattice has shown she is deficient in making proper choices in her life and that her choices have had a negative effect on Jordan's well-being and will continue to have such an effect should she regain custody of Jordan at this point in time.

*Id.* at 184, 820 N.W.2d at 663-64. Our mandate to the county court, memorializing our affirmance of the guardianship appointment was issued on October 26, 2012.

Four days after our mandate was issued, Mattice filed a petition to terminate the guardianship. In the petition, Mattice alleged that since the entry of the original guardianship order in December 2011, she had established her own home, obtained full-time employment, and continued to parent three of her other minor children who resided with her. In addition, she alleged that she had exercised consistent visitation time with Jordan and that she was "capable, willing and able to assume responsibilities of the minor child."

In January and February 2013, the court held a hearing on Mattice's petition to terminate the guardianship. Prior to the parties' presenting evidence, the court noted that the burden to prove that the guardianship should not be terminated rested with Kaaren, who opposed Mattice's petition.

At the hearing, Kaaren testified that she has been caring for Jordan for approximately 2 years, or since Jordan was 4 months old. She indicated that since the entry of the guardianship order in December 2011, she has permitted Mattice to have visitation time with Jordan, including overnight visits. However, Mattice has been sporadic in her visitation time, has canceled visits, and has failed to give Kaaren much notice about when she wants to see Jordan. In addition,

Kaaren testified that in October 2012, Jordan returned from a visit with Mattice smelling like cigarette smoke. Because Jordan has asthma and cannot tolerate being around smoke, Kaaren had to take Jordan to the doctor and Jordan had to resume "breathing treatments." At this time, Kaaren no longer permitted Mattice to have overnight visits with Jordan. Kaaren also testified that Mattice has picked up Jordan for a visit without having a proper car seat installed in her car. When Kaaren let Mattice borrow her car seat, Mattice did not know how to properly buckle Jordan in the car seat.

Kaaren testified that she is concerned that Mattice continues to make bad decisions and exercise poor judgment. Mattice apparently lied to Kaaren about being pregnant in February 2012. Instead, she became upset with Kaaren for asking if she was pregnant, citing struggles with her weight as the cause of her looking pregnant. Ultimately, Mattice placed the new baby with her cousin and planned on that cousin formally adopting the baby. Mattice never mentioned anything about the baby to Kaaren. Mattice also had contact with Jacob, Kaaren's son and Jordan's father, while he was out of jail on a furlough. Kaaren testified that she thought this might be a problem, since both Jacob and Mattice were convicted felons. Mattice's probation officer indicated that he was not aware of this contact and that it was concerning. Kaaren also testified that Mattice gave Jacob a cellular telephone to take back to jail, which he, apparently, was not permitted to have.

Mattice testified that since the entry of the December 2011 guardianship order, she has maintained stable housing for herself and her three oldest daughters. The four of them have been residing in an apartment at the Lydia House, a women's shelter, for over a year. The rent at this apartment is subsidized, so that Mattice does not have to pay anything and is able to save money toward moving to more independent housing. Mattice testified that she is not ready to move out of the shelter yet, but she presented evidence that she is an exemplary resident and that she can stay as long as she needs to.

Mattice is employed at two local fast-food restaurants, and works approximately 40 hours per week. She does work night shifts at least every Monday through Friday, which means that her three older daughters have to go to a daycare after school until approximately 11 p.m. Mattice has attempted to switch this schedule so that she can spend more time with her children, but this attempt has not yet been successful. Mattice also attended some classes at a local community college and has volunteered to assist other women who are struggling in their lives. Mattice presented evidence to demonstrate that she has been complying with the terms of her probation.

Mattice admitted that her mother smokes cigarettes and that she has taken Jordan to her mother's home; however, she denied allowing Jordan to stay overnight there since December 2011. Mattice also admitted knowing that Jordan is not supposed to be around cigarette smoke. She admitted that she has not always had a proper car seat for Jordan, but also testified that she currently has a car seat for Jordan and that she has learned from her previous experiences and understands the importance of car seats. Other evidence presented at the hearing revealed that if Mattice was not able to purchase a car seat that the Lydia House would have helped her obtain one, but Mattice never asked for such help.

Mattice also testified that she did not give Jacob a cellular telephone. She indicated that he had stolen it out of her car, without her permission. She also testified that she had a baby in

March 2012; that she did not tell Kaaren about it, because she did not think it was any of her concern; and that she planned on the baby's being adopted by her cousin.

Mattice offered evidence to demonstrate that she has been an appropriate parent to her three older children and that they are well cared for and loved.

On September 26, 2013, the county court entered an order denying Mattice's petition to terminate the guardianship. The court determined, upon considering the evidence and the applicable law, that there has been no substantial material change in Mattice's circumstances that would merit termination of the guardianship. Specifically, the court found that Mattice is still residing in a homeless shelter; that, although she is employed, such employment gets in the way of her ability to parent her children; that Mattice continues to make bad choices, including spending time with Jacob, failing to utilize car seats, and exposing Jordan to cigarette smoke; and that Mattice has only exercised sporadic visitation with Jordan.

Mattice appeals from the county court's order here.

### III. ASSIGNMENTS OF ERROR

On appeal, Mattice assigns seven errors. However, these assigned errors can be consolidated into one fundamental assertion: The county court erred in failing to terminate the guardianship over Mattice's daughter, Jordan.

### IV. STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2008 & Cum. Supp. 2012), are reviewed for error on the record. See, *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004); *In re Guardianship of Elizabeth H.*, 17 Neb. App. 752, 771 N.W.2d 185 (2009). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Guardianship of D.J., supra*; *In re Guardianship of Elizabeth H., supra*. An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings. *In re Guardianship of Elizabeth H., supra*.

### V. ANALYSIS

On appeal, Mattice asserts that the county court erred in failing to terminate Kaaren's guardianship over Jordan. Before we address Mattice's specific assertions, we detail the relevant statutory and case law concerning the termination of a guardianship.

It is well established that there are two competing principles in the area of child custody jurisprudence: the parental preference principle and the best interests of the child principle. See *In re Guardianship of D.J., supra*. Courts have long considered the best interests of the child to be of paramount concern in child custody disputes. See *id*. Yet, "the principle of parental preference provides that a court 'may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the [parent-child] relationship or has forfeited that right.'" *Id*. at 244, 682 N.W.2d at 243, quoting *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996).

See, also, § 30-2608(a) (stating that parents are natural guardians of minor child when they are "competent to transact their own business and not otherwise unsuitable").

In weighing these two principles, the Nebraska Supreme Court has held that in guardianship termination proceedings involving a biological or adoptive parent, "the parental preference principle serves to establish a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent." *In re Guardianship of D.J.*, 268 Neb. at 244, 682 N.W.2d at 243. Under this principle, a parent has a natural right to the custody of his or her child which "trumps the interest of strangers to the parent-child relationship and the preferences of the child." *Id*. at 244, 682 N.W.2d at 243-44. Therefore, for a court to deny a parent the custody of his or her minor child, it must be affirmatively shown that such parent is unfit to perform parental duties or that he or she has forfeited that right. See *id*. Thus,

> an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent [either is] unfit or has forfeited his or her right to custody. Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent.

*Id.* at 249, 682 N.W.2d at 246.

With these principles in mind, we now turn to Mattice's assertions with regard to the court's failure to terminate the guardianship of Jordan. In its order, the court found that Mattice is currently unfit to parent Jordan in that she "suffers from a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in detriment to this child's well-being." Upon our review of the record, and given our standard of review, we cannot say that the county court erred in finding sufficient evidence to warrant its denial of Mattice's petition to terminate the guardianship. The totality of the evidence presented at the guardianship hearing supports the court's decision, and as such, we affirm.

In its order, the county court found Mattice's housing situation has remained virtually unchanged since the initial guardianship proceeding because she failed to secure independent housing and, instead, continued to reside in a homeless shelter. The court's factual findings are supported by evidence in the record. Mattice testified that at the time of the hearing she resided in an apartment at the Lydia House. She indicated that she had lived there approximately 1 year and that she was not ready to move out of the shelter and into independent housing. Because of subsidies, Mattice does not pay any rent for her housing. Similarly, at the original guardianship proceedings, Mattice testified that she was living in a domestic violence shelter. She also indicated that she was planning on moving into "transitional housing" soon. While it is not clear what this "transitional housing" consisted of, presumably, Mattice previously indicated to the court that she would not be residing at a homeless shelter indefinitely.

The court also found that even though Mattice had obtained employment since the original guardianship proceeding, that this employment was not conducive to her ability to parent Jordan. Mattice testified at the guardianship hearing that she was currently employed at two different fast-food restaurants. She works at one of these restaurants five nights a week from 5 to 11 p.m. and on multiple Saturdays every month. As a result of this employment, the three

children who are currently residing with Mattice go from school to a daycare facility for the majority of the night while Mattice is working. Presumably, Jordan would also have to attend this daycare facility if she was returned to Mattice's custody. Mattice's schedule at her second job is from 11 a.m. to 2 p.m. 3 days a week, including Sundays. This job further limits Mattice's time with her children.

In addition to Mattice's testimony about her difficult employment schedule, Kaaren also testified that Mattice's employment had seriously hindered her ability to maintain a regular visitation schedule with Jordan, and thus to maintain a beneficial relationship with Jordan. Kaaren indicated that Mattice exercised her visitation time with Jordan only sporadically, that she often canceled scheduled visits with Jordan, and that she would not provide Kaaren with much notice about when she expected to see Jordan. Essentially, there was evidence that Mattice did not always make visiting with Jordan a priority in her life.

The court also found that Mattice continues to make bad choices in her life, which choices have detrimentally affected Jordan's well-being. This finding is supported by evidence in the record. The evidence revealed that despite Mattice's status as a convicted felon who is currently on probation, she chose to associate with Jordan's father, Jacob, who is also a convicted felon, while he was on a furlough from prison. In fact, Kaaren testified that Mattice gave Jacob a cellular telephone to take back to prison. Such an item is prohibited for Jacob. Mattice's probation officer testified that he was not aware of Mattice's spending time with Jacob and that such activity caused him "concern."

Other evidence revealed that Mattice failed to consistently utilize car seats when transporting Jordan and her other three children in the car. Kaaren testified that even after she provided Mattice with a car seat for Jordan, Mattice was unable to properly secure Jordan in the car seat. An employee of the Lydia House testified that if Mattice had asked for help obtaining car seats for her children, the shelter could have obtained them for her.

Finally, there was evidence presented that Mattice exposed Jordan to cigarette smoke despite knowing that such exposure seriously exacerbated Jordan's asthma. Kaaren testified that in October 2012, shortly before Mattice filed her motion to terminate the guardianship, Jordan returned from an overnight visit with Mattice smelling like cigarette smoke. Subsequent to this visit, Jordan had to go to the doctor and had to resume "breathing treatments" to control her asthma.

Viewed as a whole, the evidence presented at the guardianship hearing demonstrates that Mattice continues to be unable to provide Jordan with a stable home environment and continues to place Jordan in dangerous, inappropriate situations without regard to her safety or well-being. Just as in the original guardianship proceedings, this evidence reveals that Mattice is deficient in making proper choices in her life and that her bad choices have had a negative effect on Jordan's well-being.

We acknowledge that Mattice did present conflicting evidence at the hearing to demonstrate that she is an appropriate parent to the three children in her custody, that she has made efforts to improve her life, and that she has a desire to be a full-time parent to Jordan. However, where credible evidence is in conflict on a material issue of fact, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See *Marcovitz v. Rogers*, 267 Neb.

456, 675 N.W.2d 132 (2004). As we stated above, the county court's factual findings are clearly supported by evidence in the record. Furthermore, the court's findings sufficiently support its ultimate conclusion that Mattice is currently unfit to parent Jordan and that, as a result, Kaaren's guardianship over Jordan should not be terminated at this time.

## VI. CONCLUSION

Upon our review of the record, and given our standard of review, we find that the county court did not err when it denied Mattice's petition to terminate the guardianship over her daughter, Jordan. Accordingly, we affirm the order of the county court.

AFFIRMED.