IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE GUARDIANSHIP OF CELESTE T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP OF CELESTE T., A MINOR CHILD.

MELISSA U., APPELLANT,

V.

KATHIE J., GUARDIAN, APPELLEE, AND DARRELL T., APPELLEE.

Filed December 1, 2015.    No. A-14-736.

Appeal from the County Court for Douglas County: JOSEPH P. CANIGLIA, Judge. Reversed and remanded with directions.

Nathaniel V. Romano, Catherine M. Mahern, and Ellysa Gosar, Kelly White, Allison Heimes, and Benjamin Kessler, Senior Certified Law Students, of Milton R. Abrahams Legal Clinic, for appellant.

Diane B. Metz for appellee Kathie J.

Jay A. Ferguson for appellee Darrell T.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

INTRODUCTION

Melissa U. filed a petition in county court seeking to terminate Kathie J.'s guardianship of Melissa's daughter, Celeste T. Ultimately, the court denied Melissa's request and ordered that the guardianship continue. Melissa appeals from the court's decision here. Despite Melissa's late payment of bill of exception fees and the supersedeas bond, we find that her appeal is properly before this court. Upon our review of the record, we conclude that the county court's finding that

- 1 -

Melissa is an unfit parent was not supported by clear and convincing evidence. As such, we reverse the decision of the county court and remand with directions to terminate the guardianship.

BACKGROUND

Melissa is the biological mother of Celeste, born in March 2002. Celeste's biological father, Darrell T., has lived away from Celeste in Oregon since Celeste was about 18 months old. Darrell and Melissa were married in 2001, and the marriage was dissolved sometime during the course of these proceedings.

Kathie is Melissa's mother. Kathie became Celeste's primary caretaker when Celeste was about 18 months old. On February 9, 2005, Kathie was appointed guardian for Celeste. Melissa, who was 18 when Celeste was born, agreed to the guardianship because her finances and housing situation were unstable at the time and she was generally having a "really rough time" being a young mother with a small child. According to Melissa, Kathie also told her she could not live with Kathie if she opposed the guardianship.

On February 14, 2011, Melissa filed a petition to terminate the guardianship, alleging that she had established her own home, frequently cared for Celeste, and was willing and able to assume the responsibilities of parenting her. The county court conducted hearings on March 4, May 10, August 24, and December 13, 2011; June 12 and November 26, 2012; and April 29, 2014.

Kathie testified that when Melissa was living with her, Melissa did not care for Celeste. Melissa had a bartending job at the time and would be awake all night and sleep all day. Kathie testified that Melissa has a pattern of moving from relationship to relationship, and that after the guardianship was established, Melissa continued to live at Kathie's house at times and with boyfriends at times. Melissa represented that she lived only with her mother during this period.

Melissa has cohabitated with Anthony H. (Tony) since 2009. The two have a son together, also named Anthony H. (Anthony), who was born in 2010. At the time of trial, Tony and Melissa were planning to marry, and Melissa had not filed a paternity action to obtain support for Anthony from Tony.

After Melissa moved in with Tony, she had visitation with Celeste at their home every other weekend and every Wednesday. During part of this period, Kathie dropped Celeste off at Melissa's on her way to work, at 4:30 a.m., and Melissa took Celeste to school. This pattern of visitation continued until the time of trial. In May 2011, the county court ordered visitation to occur on an equal-time basis, alternating one week with Kathie and one week with Melissa. In December 2011, the county court altered the schedule to expand Melissa's visitation to two weeks, alternating with Kathie's one week with Celeste. In May 2013, following allegations of abuse discussed below, the county court ordered the parties to resume the equal-time schedule.

Melissa testified that she had steady employment as a manager or bartender until her place of employment closed in 2009 or 2010. While unemployed, Melissa collected unemployment benefits. In May 2011, Melissa was taking cake-making classes because she wanted to start her own cake business. At the hearing in August 2011, Melissa testified that she worked part time for a cleaning service, earning $650 per month. She generally worked between one and one-half to three hours anytime between 7 p.m. and 4 a.m., Monday through Friday. As of November 2012, Melissa was taking orders to bake cakes in her home and going to school to improve her

cake-making skills. In April 2014, Melissa was employed full time by Great Harvest Bread as a baker and was attending school to become a pastry chef.

Kathie testified that since Celeste's birth, Melissa has never had independent housing or lived alone and provided for her own support. While Melissa lived with Kathie, she did not contribute to household expenses. Since 2009, Tony, who is employed full time, has been the main source of financial support for Melissa. Tony and Melissa use his income for rent, cell phone bills, car payments for the vehicle Melissa uses (titled in Tony's name), and car insurance, as well as clothing, toys, food, furniture, and gifts for both children. Tony admitted that his parents had purchased Celeste's bedroom furniture after a bed bug infestation. Melissa and Tony also provided Celeste's art classes at the Joslyn Art Museum and Girl Scout uniforms.

Melissa testified that over the years she has provided clothing, furniture, and toys for Celeste, but it was unclear from the testimony whose income paid for these items. Melissa has purchased food using food stamps or "SNAP," and Melissa testified that she has provided all meals for Celeste at her home. Melissa has health insurance for herself and Anthony through Medicaid, and Kathie pays for Celeste's healthcare. Melissa has never contributed child support to Kathie because she had never been asked to do so.

During the course of these proceedings, Melissa and Tony have moved three times. Their latest residence is a 4-bedroom house in a family neighborhood with opportunities for outdoor activities. Celeste has her own appropriately-furnished and decorated bedroom with toys and clothes, as she did in the previous residences.

Melissa stated that she, Tony, Celeste, and Anthony participate in many activities as a family, such as crafting, going to the zoo, hiking, and seasonal activities available in the area. Melissa has attended Celeste's parent-teacher conferences, fundraisers, and recitals. She and Celeste also decorate for the holidays together, and Melissa hosted a birthday party for Celeste's ninth birthday.

Melissa testified that Tony and Celeste have a wonderful relationship and that Celeste adores Tony. Tony characterized his relationship with Celeste as "very good." Celeste told the county court in November 2012 that Tony treats her "good" and they get along, but that she is not necessarily comfortable with him because she did not grow up with a father. Tony and Celeste participate in family activities together, such as going to the park, crafts, and swimming lessons. Tony testified that he and Melissa both miss Celeste when she is not with them. Melissa testified that Celeste loves her little brother Anthony.

In May 2011, Tony testified that during the period when Kathie dropped off Celeste early in the morning, sometimes he would meet Celeste at the door and that Celeste made her own breakfast using a routine that he and Melissa had set up for her. According to Tony, Melissa would help Celeste get ready and pack her lunch before taking her to school. Tony testified that Melissa generally slept from 11 p.m. to 7 a.m. during this period and that Melissa's bedtime was variable because she was still breastfeeding Anthony and caring for him while Tony was at work. Kathie testified that Melissa met her at the door for the first month of the early morning arrangement, but after that Tony met her at the door. Kathie testified that according to Celeste, Tony helped her in the mornings and Melissa would get out of bed ten minutes before it was time to leave.

Kathie admitted that she would never leave Celeste with someone who could not properly care for her. Kathie testified that she has questioned Melissa's ability to care for Celeste, but for

the most part, Melissa has taken care of her. Kathie had not filed for guardianship of Anthony, but she testified that she would if necessary. In Tony's opinion, Melissa is a "great mother." He described her as "very headstrong, very positive." In August 2011, Melissa testified that she and Tony parent together and attempt to divide duties evenly so that they both spend time with the children and have time for household chores.

Melissa testified that she used to drink alcohol regularly, but at the time of trial, she consumed one or two drinks once every one to two months. Melissa also denied being a drug user at the time of trial. In November 2012, Celeste told the county court that Melissa has mood swings because she quit smoking.

Melissa admitted being upset with Kathie a couple of times, but she denied being angry. She admitted that she and Tony have had two or three "discussions . . . with passion," but denied arguing. Melissa denied that Celeste had ever been the recipient of her "being" upset. Tony admitted that Melissa sometimes raises her voice when she is upset and that he has heard her use profanity once or twice. Kathie testified that she has observed Melissa angry numerous times during the months preceding trial. According to Kathie, when Melissa is angry, she is loud and confrontational.

In August 2011, clinical psychologist Kevin Cahill, Ph.D., testified that he had interviewed and counseled Celeste approximately 15 times. Kathie had initiated the therapy, at Celeste's request. Dr. Cahill observed that in talking about her family life at Melissa's home, Celeste spoke more about Tony and Anthony than about Melissa. Celeste told Dr. Cahill that Melissa is often up late at night cleaning and caring for Anthony, that Melissa is often tired, and that it is important to be careful not to wake Melissa because she will become grumpy and argue with Tony, which creates a bad atmosphere in the home. Celeste told Dr. Cahill that she enjoys spending time with Melissa and looks forward to the time they spend together. Dr. Cahill opined that removing Celeste from Kathie's home would cause significant trauma for Celeste because Kathie had been her primary parental figure. He predicted that Celeste would react to such a change with depression, anxiety, withdrawal, listlessness, detachment from school, clinging behavior, dependency, and general regression. Dr. Cahill opined that Celeste's resilience was at maximum capacity and demanding a change of her would stress her beyond her capacity. He explained that Celeste has had to make a number of adjustments, and at this point in her development, asking her to shift residences and associates would be stressful to her. Dr. Cahill has observed that Melissa sometimes upsets Celeste.

In December 2011, Dr. Cahill testified that he had visited with Melissa about 14 times. Dr. Cahill conducted a Parenting Stress Inventory, and that psychological test showed that Melissa has a tendency to minimize, deny, and become overly optimistic about her relationship with Celeste. Dr. Cahill testified that these tendencies increase the potential for neglect and could prevent Melissa from performing a reasonable parental obligation for Celeste; however, with others involved in Celeste's care, such as Kathie, Tony, and Tony's parents, there would be a greater likelihood that Celeste's needs will be met. Dr. Cahill stated that other than the aforementioned tendencies, Melissa has done well. Dr. Cahill also conducted the Millon Clinical Multiaxial Inventory and noted tendencies toward narcissism, but he did not make a diagnosis. Dr. Cahill did not think Melissa was an unfit parent, and he defined "unfit" as unable to meet the basic needs of

a child on a reliable basis in terms of physical and emotional support, provision of safety, and facilitation of education and moral training.

In Dr. Cahill's opinion, because of Celeste's developing and existing attachments, it would be in Celeste's best interests to continue regular, frequent contact with Melissa and her brother Anthony, as well as Kathie. Dr. Cahill suggested continuing the equal-time visitation schedule. He recommended maintaining the guardianship to ensure that visits and communication between the parties still occurred. Dr. Cahill estimated that within 24 months from December 2011, a termination of the guardianship would be appropriate.

In November 2012, Celeste told the county court that she wanted to continue living with Kathie, but that she also liked Melissa's house. Celeste preferred the equal-time visitation arrangement, rather than spending two weeks with Melissa because she missed Kathie's house. She stated that she is comfortable at Kathie's house, but not as comfortable at Melissa's house. Celeste reported that when Melissa takes her to school, Anthony's lack of cooperation results in her being late for school about once every two weeks. Celeste testified that Anthony, who was two years old at the time, was attending daycare. Celeste stated that it is difficult to wake Melissa in the morning because of medication she takes for gastritis. According to Celeste, neither Kathie nor Melissa restricted her phone calls. Celeste stated that she loved Melissa and Kathie and that they both loved her, but that she felt closer to Kathie because she had lived with her longer. Celeste stated that she had a regular bedtime of 9:00 at both residences. Celeste said that if she wanted some advice from an adult on an important topic, she would talk to Kathie. Celeste denied that Kathie or Melissa ever left her alone in the house. Celeste denied that Kathie, Melissa, or Tony had ever spanked her. Celeste told the county court that Tony and Melissa sometimes locked her out of the house with Tony or Melissa present outside because they wanted her to play outside rather than inside.

In the spring of 2013, Celeste was at a sleepover, and during a game of truth or dare, she told her friends that Tony's father had touched her private areas over and underneath her clothing. On May 20, 2013, the county court ordered that Celeste was to have "no contact whatsoever" with Tony's father and that if Celeste should be in the presence of Tony's father during a family function, then either Melissa or Kathie must be present at all times. The county court further ordered that the parties not discuss with Celeste any matters involving the investigation by the Omaha Police Department. At this time, the county court also ordered that Celeste spend alternating weeks with Melissa and Kathie, rather than alternating two weeks with Melissa and one week with Kathie. The county court appointed a guardian ad litem (GAL), who conducted an investigation.

The GAL interviewed Celeste at Kathie's home. Celeste told the GAL that Tony's father had inappropriately touched her on numerous occasions beginning when she was 8 or 9 years old. Celeste reported that the molestation generally occurred when Tony's father was babysitting her and Anthony. Celeste believed that Tony's mother was aware of the abuse because Tony's parents often brought her clothing, furniture, and toys, comprising about half her belongings at Melissa's home. Celeste viewed these gifts as an attempt to "bribe" her not to report the molestation.

Celeste told the GAL that she feels safe in Melissa's care "as long as my brother's at home." Celeste explained that Tony's father and mother babysit her brother Anthony and that often Tony's father will come to Melissa's home at some point in the day or evening to return Anthony. Celeste

stated that seeing Tony's father at Melissa's home or knowing he was there made her feel unsafe. According to Celeste, anytime Tony's father comes to Melissa's home to return Anthony, Melissa and Tony instruct Celeste to go to her room until Tony's father leaves the home. The GAL opined that Celeste is confused by Tony's father's continued contact with Anthony and access to the family home following the abuse allegations. The GAL observed that while Celeste had been participating in individual therapy with a male therapist, such therapy had not addressed the molestation allegations because Celeste was not comfortable discussing it with him.

In December 2013 and early January 2014, the GAL attempted to arrange a meeting with Celeste at Melissa's home, but Melissa did not respond to her voicemail messages. On January 14, 2014, the GAL was able to reach Melissa when Melissa answered her telephone call. The GAL explained the need to arrange a meeting, but Melissa stated that she was driving at the time and could not schedule a meeting because she did not have access to her calendar. Melissa apologized for not returning the GAL's earlier messages, explaining that the whole family had been sick with the flu. Melissa requested returning the GAL's call at 5:00 that day, and the GAL stated that she would make arrangements to stay at work later to receive the call; however, Melissa did not call that day. Melissa returned the GAL's call the following month, in February 2014. The meeting occurred in Melissa's home on March 10.

Melissa and Tony were welcoming to the GAL. When the GAL initiated a conversation about ongoing contact between Tony's father and Celeste, Celeste excused herself from the room.

Melissa and Tony steadfastly denied that they had continued contact. During the interview at Melissa and Tony's home, they confirmed that occasionally, while Celeste was in the home, Tony's father returned Anthony to the home after babysitting him, but they reported that they did not feel his presence in the home while Celeste is in her bedroom is actual contact between the two. At trial, however, Melissa testified that to her knowledge, since the no contact order, Tony's father had never brought Anthony home after babysitting him and had not been in Melissa's house while Celeste was there. She denied sending Celeste to her bedroom while Tony's father was at the residence. Melissa opined that Celeste had been confused about the timing of Tony's father's presence at the house in relation to the no-contact order. The GAL testified that Melissa did not mention any such confusion during the course of the GAL's investigation.

At the meeting, Tony reported to the GAL that the police and the Department of Health and Human Services had investigated the allegations of molestation and determined them to be "unfounded." According to the GAL, neither Melissa nor Tony expressed belief or disbelief of the molestation allegations. Melissa and Tony admitted to the GAL that family therapy to address the issue would be appropriate and expressed a willingness to participate in Celeste's therapeutic process.

At trial, the GAL expressed concerns about the emotional impact experienced by Celeste because of continued exposure to Tony's father, who appeared to be welcome in the family home, whether Celeste is there or not. The GAL also had concerns for Celeste in Melissa's care, most significantly, that Celeste did not feel comfortable disclosing any molestation to Melissa and that, once Celeste made a disclosure, the allegations of molestation had not been addressed in a therapeutic way by Melissa. The GAL testified that Kathie seemed to have made more efforts in Celeste's therapeutic process than Melissa and Tony. According to the GAL, this reflected on Melissa's ability to meet Celeste's emotional needs, preventing her from performing a reasonable

parental obligation. The GAL admitted that under the guardianship, Melissa did not have legal authority to seek treatment for Celeste, but clarified that her concern was that Melissa had not discussed therapy with Kathie. At trial, Melissa again expressed a willingness to engage in therapeutic counseling with Celeste.

The GAL observed that Melissa and Tony openly criticized Kathie in front of Celeste, and the GAL questioned what, if any, contact Celeste would have with Kathie if the guardianship were dissolved and no visitation with Kathie was ordered by the court. Early in the trial, when asked whether she would allow Kathie to see Celeste if the guardianship were terminated, Melissa testified that she had no intention of depriving Celeste of seeing her other family members.

The GAL recommended to the county court that Celeste have no contact whatsoever, including visual contact, with Tony's father until deemed appropriate by a therapist. The GAL recommended that Celeste remain under Kathie's guardianship and that the equal-time visitation schedule continue while Celeste undergoes a therapeutic process.

In April 2014, Darrell, Celeste's biological father, testified that his relationship with Celeste consisted of texts, weekly phone calls, and six or seven visits. He stated that they were beginning to get to know one another. Celeste informed the GAL that she was comfortable with her relationship with Darrell, having phone contact and the occasional visit, and that she enjoys it.

Darrell testified that he and Kathie had agreed that in lieu of set support payments, Darrell would use his resources to contribute to travel costs and telephone calls to maintain a relationship with Celeste. According to Darrell, Kathie has never interfered with his relationship with Celeste, and he believed Kathie would foster that relationship.

Darrell opined that if the guardianship were terminated, he would not be able to continue the same relationship with Celeste. According to Darrell, Melissa had interfered with his relationship with Celeste in the past and he believed she would try to manipulate and control their relationship in the future. He also stated that he and Melissa had communicated concerning Celeste "a couple of times" and that communication between them was such that he did not believe he could discuss concerns with Melissa.

Darrell testified that usually when he called Celeste at Melissa's house, he was told that Celeste was unavailable and that Celeste often did not answer his texts when she stayed with Melissa. Darrell stated that in response he had provided Celeste with a cell phone, but that Melissa and Tony had taken the phone away. Melissa testified that she confiscated Celeste's phone because she discovered that Celeste had been communicating with unknown individuals in other states. Melissa maintained that Celeste always had access to Melissa's phone or to Tony's if she needed it. Melissa testified that she had talked to Kathie about putting restrictions on Celeste's phone.

Darrell testified that Melissa did not inform him of the abuse allegations against Tony's father. In Darrell's opinion, Melissa had not appropriately addressed Celeste's concerns and for that reason is not a fit parent.

In an order entered July 9, 2014, the county court found Melissa to be unfit and that it was in Celeste's best interests that Kathie's guardianship remain in place, along with the equal-time visitation schedule.

ASSIGNMENTS OF ERROR

Melissa generally asserts that the county court erred in declining to terminate the guardianship of Celeste. She assigns that the county court erred in finding the evidence sufficient to overcome the parental preference principle, in applying a best interest analysis, and in shifting the burden of proof to Melissa.

STANDARD OF REVIEW

Appeals of matters arising under the Nebraska Probate Code, Neb. Rev. Stat. §§ 30-2201 through 30-2902 (Reissue 2008 & Cum. Supp. 2014), are reviewed for error on the record. See, *In re Guardianship of D.J.,* 268 Neb. 239, 682 N.W.2d 238 (2004); *In re Guardianship of Elizabeth H.,* 17 Neb. App. 752, 771 N.W.2d 185 (2009). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Guardianship of D.J., supra*; *In re Guardianship of Elizabeth H., supra*. An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the lower court where competent evidence supports those findings. *In re Guardianship of Elizabeth H., supra*.

ANALYSIS

*Late Payment of Supersedeas Bond and Fee for Bill of Exceptions.*

As a preliminary matter, we first address Kathie's and Darrell's contention that Melissa's appeal should be dismissed because she failed to pay the supersedeas bond and the fee for the bill of exceptions within the prescribed periods. Kathie and Darrell argued these issues in a motion for summary dismissal, which we denied, but that does not preclude us from addressing them here. See *Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, 290 Neb. 640, 861 N.W.2d 425 (2015).

Melissa timely filed her notice of appeal and paid the docket fee, but she failed to pay the fee for the bill of exceptions within the prescribed period. Neb. Ct. R. App. P. § 2-105B(1)(e) (rev. 2010) provides:

> [T]he court reporting personnel responsible for making the record shall advise appellant of the approximate cost of the bill of exceptions immediately after receipt of the request for preparation of the bill of exceptions. Appellant shall deposit the estimated cost with the court reporting personnel within 14 days after receipt of the estimate.

(The rule further provides for the treatment of any difference between the estimate and the actual cost of the bill of exception.) The bill of exceptions was prepared on September 15, 2014. Melissa paid the fee of $1,143.50 for the bill of exceptions on February 27, 2015. Even though Melissa was substantially late in paying the fee for the bill of exceptions, her tardiness is not grounds for dismissing this appeal. The fee requirement, albeit important to the operation of our judicial system, is not jurisdictional, and we decline to consider it further. See Neb. Rev. Stat. § 25-1912(4) (Reissue 2008)(no step other than filing of notice of appeal and depositing of docket fee shall be deemed jurisdictional). See, also, *In re Interest of Kayla F.*, 13 Neb. App. 679, 698 N.W.2d 468 (2005).

As for the supersedeas bond, Melissa was tardy in paying it as well. Neb. Rev. Stat. § 30-1601 (Cum. Supp. 2014) provides:

> (3) When the appeal is by someone other than a personal representative, conservator, trustee, guardian, or guardian ad litem, the appealing party shall, within thirty days after the entry of the judgment or final order complained of, deposit with the clerk of the county court a supersedeas bond or undertaking in such sum as the court shall direct, . . . unless the court directs that no bond or undertaking need be deposited. If an appellant fails to comply with this subsection, the Court of Appeals on motion and notice may take such action, including dismissal of the appeal, as is just.
> . . .
> (6) If it appears to the Court of Appeals that an appeal was taken vexatiously or for delay, the court shall adjudge that the appellant shall pay the cost thereof, including an attorney's fee, to the adverse party in an amount fixed by the Court of Appeals, and any bond required under subsection (3) of this section shall be liable for the costs.

The county court entered its final order on July 9, 2014. Melissa did not pay the bond until February 27, 2015, well over 30 days afterward. However, Melissa's belated payment does not automatically deprive this court of jurisdiction. While § 30-1601 requires the bond, dismissal of an appeal on the basis of nonpayment is discretionary. See *In re Trust Created by Isvik*, 274 Neb. 525, 741 N.W.2d 638 (2007).

In the present case, neither appellee specifically requested a supersedeas bond. See *In re Estate of Sehi*, 17 Neb. App. 697, 772 N.W.2d 103 (2009)(sustaining motion to require appellants to file supersedeas bond and setting amount to be required, rather than dismissing appeal for lack of jurisdiction). Although Kathie's motion to bar Melissa from proceeding in forma pauperis did allege that Melissa was capable of paying the costs of filing fees, the bill of exceptions, and the transcript, that motion did not mention the supersedeas bond, and the evidentiary hearing on that motion is not in the record before us. We further observe that the underlying issue in this case does not involve the need to protect property or income but, rather, custody of a juvenile. Finally, Melissa did eventually pay the bond, although quite late in the process. Considering these factors, we conclude that it would not be just for this court to exercise its discretion under § 30-1601(3) to dismiss the appeal due to Melissa's late payment of the supersedeas bond.

Accordingly, we move on to consider the merits of Melissa's appeal.

*Termination of Guardianship.*

On appeal, Melissa asserts that the county court erred in failing to terminate Kathie's guardianship over Celeste. We begin by addressing Melissa's assertion that the county court improperly shifted the burden of proof to her. Kathie, who opposed the termination of the guardianship, was to bear the burden of proving by clear and convincing evidence that Melissa is unfit. See *In re Guardianship of D.J., supra.* Melissa argues that the county court placed the burden on her because it directed her to present her evidence first. We acknowledge that as the "party who would be defeated if no evidence were given on either side," the party opposing termination of a guardianship should proceed first. Neb. Rev. Stat. § 25-1107(3) (Reissue 2008), Neb. Rev. Stat. § 25-1128 (Reissue 2008). However, our civil procedure statutes allow the court to direct

otherwise. See *id*. Stating its awareness of Melissa's constitutional rights, the county court directed Melissa to present her evidence first, and the record as a whole and the reasoning and conclusions in the county court's order show that the county court properly placed the burden of proof on Kathie. Melissa's assertion that the county court acted otherwise lacks merit.

Before we address Melissa's specific assertions concerning the sufficiency of the evidence presented, we detail the relevant statutory and case law concerning the termination of a guardianship.

It is well established that there are two competing principles in the area of child custody jurisprudence: the parental preference principle and the best interests of the child principle. See *In re Guardianship of D.J., supra*. Courts have long considered the best interests of the child to be of paramount concern in child custody disputes. See *id*. Yet, "the principle of parental preference provides that a court 'may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the [parent-child] relationship or has forfeited that right.' " *Id*. at 244, 682 N.W.2d at 243, quoting *In re Interest of Amber G. et al.,* 250 Neb. 973, 554 N.W.2d 142 (1996). See, also, § 30-2608(a) (stating that parents are natural guardians of minor child when they are "competent to transact their own business and not otherwise unsuitable").

In weighing these two principles, the Nebraska Supreme Court has held that in guardianship termination proceedings involving a biological or adoptive parent, "the parental preference principle serves to establish a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent." *In re Guardianship of D.J.,* 268 Neb. at 244, 682 N.W.2d at 243. Under this principle, a parent has a natural right to the custody of his or her child which "trumps the interest of strangers to the parent-child relationship and the preferences of the child." *Id*. at 244, 682 N.W.2d at 243-44. Therefore, for a court to deny a parent the custody of his or her minor child, it must be affirmatively shown that such parent is unfit to perform parental duties or that he or she has forfeited that right. See *id*. Thus,

> an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent [either is] unfit or has forfeited his or her right to custody. Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent.

*Id.* at 249, 682 N.W.2d at 246.

Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. See *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011). Evidence of unfitness should be focused upon a parent's ability to care for a child, and not any other moral failings a parent may have. *Id.* It is equally worth emphasizing, however, that evidence of unfitness should be focused upon a parent's present ability to care for a child and that evidence of a parent's past failings is pertinent only insofar as it suggests present or future faults (although in some instances, such evidence may be very pertinent). *Id.*

With these principles in mind, we now turn to Melissa's assertions with regard to the court's failure to terminate the guardianship of Celeste. She specifically assigns that the county court erred in finding the evidence sufficient to overcome the parental preference principle and in applying a best interests analysis rather than basing its conclusions on an evaluation of Melissa's fitness as a parent. In its order, the county court found that Melissa is unfit to parent Celeste and that it is in Celeste's best interests that Kathie's guardianship continue. However, upon our review of the record, we cannot say that the finding of unfitness is supported by clear and convincing evidence.

The county court found that Melissa was dependent on Tony for financial support, and the evidence supports this factual finding. There was evidence that Tony paid most of Melissa's expenses, including expenses related to Celeste, and there was no evidence that Melissa had the means to support herself and Celeste independently. Kathie testified that Melissa had never supported herself financially.

Melissa's lifelong financial dependence, in particular her dependence on Tony, who has no legal obligation to support her and Celeste, does show a want of maturity and stability regarding financial matters, but it does not rise to the level of unfitness. We are not to consider that Kathie may provide a more economically advantageous home situation for Celeste than Melissa. See *In re Interest of Amber G. et al.*, 250 Neb. 973, 554 N.W.2d 142 (1996). Further, we note that during much of this period of financial dependence on Tony, Melissa was primarily caring for their young son, Anthony. And there was evidence that at the time of trial Melissa was on the path to becoming more financially independent. During the pendency of this matter, she was working to enhance her baking skills, and she was employed full time in that field at the close of trial.

The county court found that Melissa's personality trait of narcissism may prevent the performance of a reasonable parental obligation. The record supports the finding that Melissa demonstrated the trait of narcissism in psychological testing, but there was no evidence that this trait would affect Melissa's ability to parent. Other psychological testing did show that Melissa had a tendency to minimize, deny, and become overly optimistic about her relationship with Celeste. And there was testimony that these tendencies to minimize, deny, and be overly optimistic could prevent Melissa from performing a reasonable parental obligation for Celeste, but Dr. Cahill opined that with others involved in Celeste's care, such as Kathie, Tony, and Tony's parents, there would be a greater likelihood that Celeste's needs will be met. He also testified when asked, that it was his opinion that Melissa was a fit parent. We recognize that at the time Dr. Cahill testified, allegations of molestation by Tony's father had not yet been made. Nonetheless, we conclude that the likelihood that the aforementioned deficiencies "could" cause harm to Celeste was not definite enough to support a finding of unfitness, where the likelihood of harm must be probable rather than merely possible.

The county court found that Melissa had disputed Celeste's statements about continuing contact with Tony's father following allegations of molestation. This factual finding is supported by the evidence. Celeste reported to the GAL that after the court's no-contact order, Tony's father would sometimes drop Anthony off at Melissa's house, at which point Melissa and Tony would send Celeste to her room. Melissa admitted this pattern during the GAL investigation, but said she did not think it constituted direct contact between Celeste and Tony's father. Later, at trial, Melissa denied that Tony's father ever dropped Anthony off after the no-contact order and that she ever

sent Celeste to her room. Melissa claimed that Celeste must have been mistaken about the timing of these visits in relation to the no-contact order.

The county court apparently deemed Celeste's account of her contact with Tony's father to be credible. Where credible evidence is in conflict on a material issue of fact, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. See *Marcovitz v. Rogers,* 267 Neb. 456, 675 N.W.2d 132 (2004). The GAL stated that the contact Celeste described was confusing and could be emotionally harmful for Celeste. Celeste reported that she did not always feel safe in Melissa's home because of the possibility that she would see Tony's father there.

Other evidence showed that Melissa was willing to participate in Celeste's therapeutic process following the molestation allegations. However, she did not address the matter with Kathie, who had the legal authority to obtain therapy for Celeste. Further, the GAL expressed concern that Celeste had not felt comfortable disclosing the allegations of molestation to Melissa and that Melissa lacked the ability to meet Celeste's emotional needs concerning the abuse.

The county court found that the GAL had difficulty scheduling an interview with Melissa to discuss the molestation allegations, and this finding is supported by the record. In light of other evidence of Melissa's treatment of the molestation allegations, her behavior in this matter does seem suspect, but there was no direct evidence that she was being intentionally evasive.

The allegations of sexual abuse, and Melissa's response to them, are very troubling, indeed. However, the alleged abuse did not occur when Melissa was present, and Melissa evidently had no knowledge of any abuse until Celeste disclosed it. We note, too, that, while we do not condone allowing Tony's father in the home, Melissa did try to prevent contact between him and Celeste by sending Celeste to her room, and the evidence shows that Melissa did believe she was abiding by the no-contact order. (That order allowed "no contact whatsoever" between Celeste and Tony's father, but it also provided that if Celeste should be in the presence of Tony's father during a family function, then either Melissa or Kathie must be present at all times.)

Melissa's conflicting statements about contact after the no-contact order and her shortcomings in addressing the abuse with Celeste are troublesome, however, such matters do not support a finding of unfitness.

Moreover, there was evidence tending to show that Melissa is a fit parent for Celeste. Melissa presented evidence to demonstrate that she is an appropriate parent to Anthony, that she has made efforts to improve her life, and that she has parented Celeste appropriately on an equal-time basis. There is also evidence that she, with Tony's help, has provided an appropriate residence for Celeste and offers Celeste her engagement and support in many enriching activities. At the time of trial, Melissa and Tony appeared to provide a stable, organized, and disciplined family environment for Celeste.

While we share the county court's concerns about Melissa's flaws and mistakes, we are mindful that "'"[t]he law does not require perfection of a parent."'" *In re Lakota Z.*, 282 Neb. at 595, 804 N.W.2d at 183 (2011), *quoting In re Interest of Xavier H.*, 274 Neb. 331, 350, 740 N.W.2d 13, 26 (2007). Viewed as a whole, the evidence presented at the guardianship hearing demonstrates that Melissa is not an unfit parent for Celeste.

The county court concluded that it was in Celeste's best interests that Kathie continue as Celeste's guardian, with the equal-time visitation arrangement. See Neb. Rev. Stat. § 30-2610

(Reissue 2008) (county court may appoint as guardian any person whose appointment would be in best interests of minor.) We agree that this conclusion would have been amply supported by the evidence, had there been clear and convincing evidence that Melissa was an unfit parent, but there was not. And the Nebraska Supreme Court has established parental unfitness as a threshold consideration in cases such as this one, before we may consider what non-parental placement would be in the child's best interests, unlike custody determinations in dissolution of marriage cases. See *In re Guardianship of D.J., supra*, Neb. Rev. Stat. § 42-364(2) (Cum. Supp. 2014) ("Custody shall be determined on the basis of the best interests of the child . . ."). See also, Neb. Rev. Stat. §§43-2922(3) and 43-2923 (Cum. Supp. 2014) (defining best interests of the child).

By no means do we diminish the substantial role that Kathie has undertaken in Celeste's life. We commend her for stepping in to parent Celeste during her most formative years. And we recognize that consistent and substantial contact with Kathie during the years to come will be highly beneficial to Celeste. Nonetheless, the evidence adduced at trial, when considered in light of the parental preference principle, requires us to conclude that the judgment of the county court must be reversed.

## CONCLUSION

We have determined that despite Melissa's late payment of bill of exception fees and the supersedeas bond, this appeal is properly before us. Upon our review of the record, we find the county court erred when it denied Melissa's petition to terminate the guardianship over her daughter, Celeste. Accordingly, we reverse the order of the county court denying Melissa's application to terminate the guardianship and remand with directions to terminate the guardianship and to reinstate in Melissa the care, custody, and control of Celeste.

REVERSED AND REMANDED WITH DIRECTIONS.