ALICIA LEAH CONN, APPELLEE, V.
BOBBY JOE CONN, APPELLANT.
722 N.W.2d 507

Filed October 3, 2006.    No. A-05-1337.

Bobby Joe Conn, pro se.

Daniel O. Mingus for appellee.

INBODY, Chief Judge, and MOORE and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

Bobby Joe Conn, previously convicted of conspiracy to murder Alicia Leah Conn and sentenced to 20 to 30 years' incarceration, appeals from the decree dissolving his marriage to Alicia which awarded Alicia custody of the parties' minor child and denied Bobby visitation with the child. Finding no abuse of discretion, we affirm.

## BACKGROUND

The parties married in January 2000, and a child was born to the marriage in May. The parties separated in mid-February 2001, and Alicia and the child moved out of the home of Bobby's parents. On September 26, 2001, an apparent friend of Bobby attempted to kill Alicia at her apartment, where she was residing with the child. Alicia sought dissolution of her marriage to Bobby upon becoming aware that Bobby had engaged in a conspiracy to have her killed. On October 11, 2002, pursuant to a jury verdict finding Bobby guilty of conspiracy to commit murder in the first degree, the district court for Sherman County sentenced Bobby to imprisonment for 20 to 30 years with credit for time served. Bobby's parents were also convicted of felony charges arising out of the conspiracy. Alicia's petition for dissolution came on for trial on May 14, 2004. On June 14, the district court entered a decree dissolving the marriage, granting Alicia custody of the parties' child, ordering Bobby to pay

minimal child support, and refusing Bobby visitation with the child. Bobby appealed to this court, and we determined that the district court had failed to afford Bobby a reasonable opportunity to defend himself in the dissolution proceeding and had thereby deprived him of procedural due process. *Conn v. Conn*, 13 Neb. App. 472, 695 N.W.2d 674 (2005). We reversed the district court's dissolution decree and remanded the cause for further proceedings. *Id.*

On September 29, 2005, the district court held a final hearing pursuant to this court's remand. Bobby appeared telephonically. The child was 5 years old at the time of the hearing.

Alicia testified that the child had been in her custody most of the time since the parties' separation. The child stayed with Alicia's sister, Kayla Nilsen, from mid-May 2004 until April 2005. At the beginning of that period of time, Alicia traveled to Lincoln, Nebraska, to "start a new life" and "g[e]t things set up for [the child]." Alicia intended to have the child live with her in Lincoln once she was situated, but that did not occur. Alicia testified that she started a telemarketing job in Lincoln and was informed by an individual on work release from the Nebraska State Penitentiary who was working at the telemarketing firm to "watch [her] back." Alicia testified that the individual, whose name she could not recall, told her that he knew Bobby, that he had "heard stories," and that Alicia should "watch [her] back because it wasn't over." Alicia testified that she became frightened and left Nebraska. When asked why she did not take the child with her, Alicia testified, "She was already growing up seeing me scared, always looking . . . over my shoulder. I didn't want her growing up in that state, always being afraid. And I knew that she was going to be safe with [Nilsen] and my family."

Alicia did not keep in touch with her family after initially leaving the state. Alicia's stepmother testified that she did not know Alicia's whereabouts for 6 to 8 weeks after Alicia left Lincoln. Alicia's father filed a guardianship action on the child's behalf because he "didn't know for sure where Alicia was, and in case anything happened to [the child] or anything, wanted to be legally prepared." Nilsen and her husband were appointed guardians of the child. Nilsen testified that the purpose of the

guardianship was to have power in case of an emergency. During the time that Alicia was absent from the state, Nilsen testified, Alicia would call approximately biweekly to check on the child. Nilsen testified that Alicia did not give her any money for expenses or food for the child but that Nilsen felt she and her husband "were adequate for that job."

Upon her return to Nebraska in October 2004, Alicia resided with her grandmother in Burchard, Nebraska, and had visitation with the child. Alicia testified that she was not financially or emotionally stable enough to support the child at that time. In approximately February 2005, the child began staying with Alicia overnight and for a couple of days at a time before going back to stay with Nilsen and her husband. Nilsen testified that there was a "transition period" in January or February through April 2005 with visitation every 2 weeks. During the transition period, Nilsen observed Alicia's interaction with the child, and Nilsen opined that Alicia was capable of caring for the child. At the end of March or beginning of April, the child began living full time with Alicia in her three-bedroom apartment in Grand Island, Nebraska. We digress to note that following the September 29, 2005, hearing, this court vacated the appointment of Nilsen and her husband as the child's coguardians and remanded the cause for further proceedings. See *In re Guardianship of Breeahana C.*, 14 Neb. App. 182, 706 N.W.2d 66 (2005). In April 2005, Alicia gave birth to another child. Alicia sought custody of the parties' child, testified that she was a fit and proper person to have custody, and believed that it would be in the best interests of the child for the child to be with Alicia. She testified that she and the child were now stable and were both receiving counseling and attending support groups. Alicia's stepmother testified that Alicia's apartment was very clean, that the child has a very close relationship with Alicia, and that Alicia was a fit parent.

Alicia testified that Bobby should not be allowed visitation because he had hired people to kill her and the child was present in the apartment at the time the attempt on Alicia's life occurred. Although Alicia did not believe it was in the child's best interests to be alienated from Bobby, she was concerned that Bobby would be a bad influence on the child and did not believe it was

appropriate for a 5-year-old child to have continual contact and visitation at a prison facility.

Wanda Sierks, Bobby's aunt, testified that she observed Bobby to be a responsible and loving father. Sierks testified that Bobby asked her to act as the child's guardian and that she would be willing to provide the necessary financial and emotional support for the child. Sierks agreed to pick up the child and take the child to visitation with Bobby if the court allowed such visitation. Sierks' husband testified, "I never thought a child should be taken away from its mother or disrupted from a happy home. I was led to believe that she was being abandoned and unloved and going to be up for adoption. But it don't sound like that's the case." Bobby's brother testified that Bobby seemed like a competent father when he observed Bobby's visits with the child. Bobby's brother testified that on numerous occasions, the child had diaper rash and yeast infections when Bobby got the child for visitation. Bobby's brother testified that he had not seen the child in almost 4 years and that he missed her.

On October 12, 2005, the district court filed its decree of dissolution. The court stated that Bobby was incapable of performing his parental obligations due to his incarceration and that Alicia was a fit and proper person to be awarded custody of the child. In denying Bobby visitation, the court found that visitation with Bobby at the time and under the circumstances presented to the court was not in the best interests of the child. The court ordered Bobby to pay child support in the amount of $10 per month. Bobby timely appeals. Pursuant to this court's authority under Neb. Ct. R. of Prac. 11B(1) (rev. 2005), this case was ordered submitted without oral argument.

## ASSIGNMENTS OF ERROR

Bobby alleges that the district court erred (1) in finding that Alicia was a fit and proper parent for the care and custody of the child and (2) in holding that incarceration was sufficient justification for the denial of visitation.

## STANDARD OF REVIEW

■ Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial

court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

■ A judicial abuse of discretion requires that the reasons or rulings of a trial judge be clearly untenable, unfairly depriving a litigant of a substantial right and a just result. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

## ANALYSIS

*Custody.*

Bobby argues that the district court abused its discretion in awarding Alicia custody of the child because Alicia abandoned the child and neglected to care for the child when Alicia departed Nebraska and left the child with Alicia's relatives. Bobby contends that the court should have appointed Sierks, the child's great aunt, the temporary guardian of the child.

■ Under the parental preference principle, a parent's natural right to the custody of his or her children trumps the interest of strangers to the parent-child relationship and the preferences of the child. *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004). A court may not properly deprive a parent of the custody of a minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id.*; *Gomez v. Savage*, 254 Neb. 836, 580 N.W.2d 523 (1998). " 'Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.' " *Uhing v. Uhing*, 241 Neb. 368, 375, 488 N.W.2d 366, 372 (1992), quoting *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990).

Bobby's argument that Alicia is an unfit mother focuses on the fact that Alicia left the child with relatives when Alicia fled Nebraska after allegedly being threatened. Alicia explained that she was frightened at the time, that she did not want the child to grow up seeing Alicia "always being afraid," and that she knew the child would be safe with Alicia's family. In finding that Alicia was a fit and proper person to be awarded custody, the district

court stated, "The reason for [Alicia's] absence is understandable. The actions of [Alicia] did not indicate an indifference of a parent for a child's welfare over a long period of time. Those actions indicated parental concern for her child." We agree. At the time of the hearing, Alicia was living in a three-bedroom apartment, caring for her two children, and attending a community college. The evidence is insufficient to establish that Alicia was unfit or forfeited her parental rights; therefore, we will not deprive her of custody of the child. This assignment of error is without merit.

*Visitation.*

Bobby argues that the district court abused its discretion by relying solely on his incarceration to deny his request for visitation. He relies upon the principle of law that incarceration alone is not sufficient justification to deny a prisoner's right to visit his children. See *Nielsen v. Nielsen*, 217 Neb. 34, 348 N.W.2d 416 (1984). However, the fallacy in Bobby's argument is that his incarceration is not the sole reason, or even the most important reason, to deny visitation. A parent's rights are not absolute and must yield to the best interests of the child. *Id.*

Factors to consider in determining reasonable visitation rights include age, health, welfare, educational and social needs, the need for a stable home environment free of unsettling influences, the fitness of the noncustodial parent for such visitation, and the relationship of the child to that parent. See *id*. The child was 5 years old at the time of the hearing, was apparently healthy, and was receiving counseling with Alicia. The child was 2 years old when Bobby began serving his sentence of 20 to 30 years' incarceration. The child would need to be transported from Grand Island to Lincoln in order to visit Bobby, and Sierks agreed to provide such transportation. Alicia did not want Bobby to have visitation because he hired people to kill her and the child was present at the time of the attempt. Alicia was concerned that Bobby would be a bad influence on the child, and she did not believe it was appropriate for a 5-year-old child to have visitation at a prison facility. However, Alicia did not believe it was in the child's best interests to be alienated from Bobby. One of Bobby's aunts testified that the child was a

"daddy's girl," but the aunt had last observed Bobby with the child when the child was a little over 1 year old. Although Bobby's first cousin, a correctional officer at the Tecumseh State Correctional Institution, testified that in her employment, she observed fathers with their children, and that the children did not seem scared of their fathers, there was no evidence regarding the procedures for visitation, location, circumstances, or the effect the visitation would have on the child.

■ In *Bruce v. Bruce*, 11 Neb. App. 548, 656 N.W.2d 281 (2003), this court concluded that the district court's order denying the father visitation based solely on the father's incarceration was an abuse of discretion because the record was devoid of any evidence suggesting that denying such visitation was in the best interests of the children. In the instant case, although the parties did not adduce any expert testimony regarding the impact visitation would have on the child, the district court noted that Bobby last had contact with the child when the child was 16 to 17 months old, nearly 4 years prior to the final dissolution hearing, and that the child had had no contact with her paternal side of the family for almost 4 years. With regard to cases involving termination of parental rights, Nebraska appellate courts have declared that when a parent whose parental rights are at issue has been incarcerated, we consider the nature of the crime committed, as well as the person against whom the criminal act was perpetrated. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002). See, also, *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982); *In re Interest of Azia B.*, 10 Neb. App. 124, 626 N.W.2d 602 (2001); *In re Interest of Theodore W.*, 4 Neb. App. 428, 545 N.W.2d 119 (1996). We think it is also proper to consider the nature of the crime committed and the person against whom it is committed in cases such as the one before us.

While it is natural to focus on Alicia as the object of Bobby's crime, the subject child was also a victim of Bobby's scheme. Had Bobby's conspiracy achieved its end, the child would have been forever deprived of her mother. Moreover, the attempt to carry out the killing occurred while the child was present in the next room, placing her in considerable risk of physical harm. These acts in detriment of the child's best interests, and not the

incarceration which flows as a consequence thereof, are the principal reasons for denial of visitation. Bobby's argument that mere incarceration is the reason for denial of visitation highlights his lack of comprehension that his child, as well as his estranged wife, was a victim of his crime.

We agree with the district court that the act for which Bobby was convicted reflected negatively on his character, that Bobby evidenced little regard for his child and the impact that his plan would have had on the child, and that the attempted murder placed the child in danger. We conclude that the district court did not abuse its discretion in denying Bobby visitation rights at this time.

## CONCLUSION

We conclude that the district court did not abuse its discretion in awarding Alicia custody of the child or in denying Bobby visitation with the child.

AFFIRMED.