IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KRISTINA S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KRISTINA S.,
A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BENJAMIN S., APPELLANT.

Filed July 23, 2019.    No. A-18-864.

Appeal from the County Court for Adams County: MICHAEL P. BURNS, Judge. Affirmed.

Derek Terwey for appellant.

Cassie L. Baldwin, Deputy Adams County Attorney, for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

MOORE, Chief Judge.

INTRODUCTION

Benjamin S. appeals from the order of the county court for Adams County, sitting as a juvenile court, which granted the State of Nebraska's petition for appointment of a guardian for his minor child, Kristina S., and denied his request for supervised visitation with Kristina. Because the evidence supports a finding that Benjamin was incapable at the time of trial of performing his parental obligation to meet Kristina's emotional needs and that reunification between them would be detrimental to her well-being, the juvenile court did not err in granting the petition for guardianship. Further, the court did not err in denying Benjamin's request for supervised visitation. Accordingly, we affirm.

- 1 -

BACKGROUND

Benjamin is the biological father of Kristina, born in September 2001. Kristina's parents are divorced, and at the start of the juvenile court proceedings, Benjamin had custody of Kristina and her younger sister pursuant to a district court order in the divorce proceedings. Kristina's mother consented to the guardianship of Kristina by Kristina's current foster parents during the course of the juvenile court proceedings and is not involved in the present appeal. Kristina has also executed a nomination supporting and consenting to her current foster parents being appointed as her coguardians.

Following their parents' divorce, Kristina and her sister moved to Georgia in the spring of 2016 to live with their stepmother (whose marital status with respect to Benjamin at the time of trial was unclear). Benjamin never joined them in Georgia, and in December 2016, the girls returned to live with Benjamin in Nebraska.

Kristina and her sister were removed from Benjamin's care on December 31, 2016, due to allegations of Benjamin's physical abuse of Kristina. The juvenile court case with respect to Kristina's sister was dismissed; she returned to Benjamin's home on January 12, 2017, and has remained in his care since that time. Kristina has remained in out-of-home placement since her removal and has resided continuously with her current foster parents since June 5, 2017. Benjamin and Kristina have not had any unsupervised contact with one another since prior to Kristina's removal; their only visitation contact during the pendency of this juvenile court case has occurred in a therapeutic setting with the last therapeutic visit having occurred sometime in March 2018. There was a no-contact order in place, apparently through the criminal case that resulted following Kristina's removal, which was lifted for purposes of therapeutic contact in this case.

While the record on appeal includes a copy of the juvenile court's order establishing the guardianship at issue, it does not include any of the underlying petitions, motions, or orders in this case. However, a recitation of the procedural history of this case was included in the guardianship order, and we briefly detail it here. On January 4, 2017, the State filed the underlying juvenile case, and the court ordered Kristina's placement in the temporary custody of the Nebraska Department of Health and Human Services (the Department). Kristina was adjudicated as a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) on April 6. On May 1, 2018, Benjamin filed a motion for supervised visits, which the court accepted as his objection to the visitation order limiting contact between Benjamin and Kristina to only therapeutic contact under the direct supervision of a therapist. The most recent review hearing occurred on June 25, at which time Benjamin objected to the case plan adopted by the court, which included a concurrent permanency plan for guardianship. On July 12, "the Guardian Ad Litem, who was joined by the State," filed a petition for appointment of a guardian of a minor child, alleging, among other things, that Kristina's current foster parents should be appointed as her guardians.

Evidentiary hearings on the guardianship petition and Benjamin's motion for supervised visitation were held on July 19 and 26, 2018. We note that Kristina was 16 years old at the time of the hearings.

Dr. Jody Lieske, a licensed psychologist testified about the therapeutic services she provided to Kristina and Benjamin both before and during this juvenile court case. Initially, Lieske

provided individual therapy for Kristina from May 2015 until April 2016 when Kristina moved to Georgia. During this period, Benjamin sat in on a few of the therapy sessions, which were initiated to address Kristina's adjustment to living with Benjamin following her parents' divorce and "some symptoms of depression." According to Lieske, Benjamin and Kristina's relationship was strained during this period. She testified that in March 2016 she made a report to Child Protective Services due to Kristina's report to her of an incident of physical abuse by Benjamin.

Lieske resumed providing individual therapy to Kristina in February 2017. According to Lieske, the focus of therapy with Kristina at that time was to begin building a relationship between her and Benjamin, and one way that was facilitated by Lieske was through the exchange of letters between Benjamin and Kristina. Lieske authored a letter to the Department caseworker dated February 23, 2017, after renewing therapy with Kristina. In the letter, Lieske stated, "Based on my history with this family, it is my recommendation, at this time, Kristina not be required to have contact with her father. . . . I would also recommend that [Benjamin] have a psychological evaluation, drug screen, and substance abuse evaluation, prior to any contact with Kristina."

Lieske also facilitated therapeutic visitation sessions between Benjamin and Kristina in her office on three occasions between July 17 and August 7, 2017. Prior to the start of the therapeutic visitation in July, there had been no in-person contact between Benjamin and Kristina since her removal from his care at the end of December 2016. During the August 7, 2017, session, Benjamin and Kristina became upset with one another. Lieske had asked Kristina to discuss how she had been hurt by Benjamin's actions. While doing so, Kristina was "cussing at [Benjamin], and yelling, and saying things to him about . . . wanting [him] to die." According to Lieske, from the start of Kristina's recitation and prior to her cursing at him, Benjamin "became immediately defensive" and told Lieske that she needed "to stop her and control her from being disrespectful." Lieske testified that Benjamin became "increasingly verbally aggressive" during the session, despite her multiple requests for him to "please calm down," that she was "intimidated" and "uncomfortable" with his behavior, and that "our nurses could hear the yelling going on." Benjamin did not become physically aggressive during the session, but according to a letter Lieske wrote to the Department case manager following the session, which we discuss further below, Benjamin's increased verbal aggression was directed toward both Lieske and Kristina. Lieske testified that because Benjamin "continued to be disrespectful and very aggressive," she ended the session and walked Kristina out to the waiting room. Lieske spoke further with Benjamin and explained to him that his behavior was intimidating and inappropriate. She testified that Benjamin continued to argue with her, so she just asked him to leave. Lieske noted that Kristina's anxiety and depression were exacerbated by her visits with Benjamin and led her to "regress in terms of wanting to sleep more, not participating in her school activities, her grades, those types of day-to-day functioning." As noted above, Lieske authored a letter to the Department case manager dated August 15, 2017, in which she stated, "I am willing to continue individual therapy with Kristina but I will not continue therapeutic sessions with [Benjamin] present. [Benjamin] clearly cannot control his temper in a therapeutic setting with his teenage child so I have little confidence that he can remain calm in other settings."

Lieske continued to provide individual therapy for Kristina, and at the time of her testimony, she was seeing Kristina approximately every 2 weeks. According to Lieske, Kristina has been making progress toward the goals of her treatment plan, but she continues to maintain

that she does not want to have visitation with Benjamin. Lieske had no opinion about whether visits between Benjamin and Kristina would be beneficial as of the time of trial. However, she felt the proposed guardianship would be beneficial for Kristina due to several positive indicators in her current placement, including more progress in therapy, obtaining her driver's license, staying out of trouble, goals for the future, and improved mood. Lieske opined that the guardianship would provide "continued consistency" for Kristina.

After the cessation of therapeutic visitation with Lieske, further therapeutic visitation was facilitated by Dr. Beverly Patitz, a licensed independent mental health practitioner with a Ph.D. in mental health. She initially met with Benjamin for two individual sessions, beginning in October 2017. She also met with Kristina for three individual sessions, two of which occurred before any joint sessions with Benjamin. During the first session with Kristina, she commented that she did not want visitation. Kristina had not changed her opinion with respect to visitation by the time of the second session with Patitz, and she told Patitz that she was still frightened of her father and did not trust that he had changed. Patitz also had Benjamin and Kristina exchange letters, but she indicated that that form of communication did not really work for them. Patitz then met with both Benjamin and Kristina for seven or eight sessions. We note that in his testimony Benjamin only recalled approximately four joint therapeutic sessions between him and Kristina with Patitz. According to Patitz, two of the joint sessions "went well;" however, in February 2018, the sessions became more volatile. As a result of the increased tension, the last two therapeutic sessions were conducted with Kristina and Patitz in the office speaking to Benjamin by telephone. Patitz testified that Kristina "was physically and mentally done [with Benjamin]" and she "was not doing well in any area." Patitz testified that therapeutic sessions with Benjamin and Kristina were discontinued in late March or early April 2018 because "Kristina did not want to see [Benjamin]" and his frustration was increasing.

At trial, Patitz testified that the therapeutic visits were having a negative impact on Kristina, and she opined that continuing such visits as of the time of trial would be detrimental to Kristina. Patitz was asked about what needed to occur before any further visitation between Kristina and Benjamin. Patitz recommended that Kristina work through her issues with her therapist and that Benjamin focus on "learning how to develop a relationship, rather than be a parent." She opined that if Kristina were placed back with Benjamin, he could provide for her physical needs but would not be able to provide for her emotional needs. Patitz stated, "I have seen him show compassion and some empathy. I don't believe that when it's rejected, that that would be handled well." Patitz opined that the proposed guardianship with Kristina's current foster parents would be in her best interests and that resuming visitation with Benjamin without them each doing further individual therapy would not be in her best interests.

Benjamin testified about Kristina's behavior in the home after his divorce from her mother and prior to her removal, describing her as disobedient, defiant, and unwilling to listen to him as a parent, which caused a strain on their relationship. He indicated that her attitude and behavior worsened to the point where he began to seek outside resources to assist with her behavior but that he "ran into nothing but solid brick walls because . . . Kristina had not gotten into any legal trouble." According to Benjamin, between April 2015 and December 2016, Kristina told him multiple times that she did not have to listen to him as a parent.

Benjamin admitted that he was on probation as a result of the incident that led to Kristina's removal in December 2016. He was originally charged with felony child abuse as a result of the incident but pled to a misdemeanor assault charge. At the time of trial, there was a pending motion to revoke Benjamin's probation due to another pending assault charge.

Benjamin described the final therapeutic session in Lieske's office, including Kristina's inappropriate comments about Benjamin's cancer diagnosis and angry behavior. He indicated that he asked Lieske to "control her" and that he was extremely upset and crying in response to Kristina's behavior. He denied yelling at Lieske, but he acknowledged that he probably raised his voice while conversing with Lieske after Kristina left the room. He also testified about the therapeutic sessions with Patitz. He felt that the exchange of letters between himself and Kristina facilitated by Patitz "went very well, as well as could be expected." He recalled Kristina stating in one letter that she did not want to have contact with him. Benjamin felt that Kristina was more receptive to "what [he] was saying" during the in-person visits than during the phone visits facilitated by Patitz, although he agreed that the last in-person visit ended "on a bad note."

Benjamin testified that while living with him, Kristina attended school on a regular basis and her grades were mostly As and Bs. The juvenile court received copies of Kristina's grades and attendance for the 2017-18 school year, after her removal from Benjamin's home. These exhibits show that she received mostly Bs and Cs during the year and received one D and one F during the second semester. She had several absences, many of which were related to attending various physical therapy appointments for a knee injury as well as appointments for individual mental health therapy.

Benjamin testified that he was not in favor of the guardianship or appointment of the current foster parents as guardians. He testified that he was able to provide for the needs of Kristina's sister in his home and that he would similarly be able to provide for Kristina if she were returned to his care. He also testified that he had not refused anything that had been asked of him by the Department and to his belief that he had not been given an opportunity to parent Kristina since her removal.

The current Department caseworker testified that since becoming the ongoing case manager in mid-January 2017, she has had regular contact with Kristina, her current foster parents, school and probation officials, and therapists. Kristina was successfully released from probation during the course of this case. The record from the guardianship/visitation trial does not show why she was on probation but a Department court report received at an earlier hearing indicates that Kristina "has a citation for assault" and "MIPs for open container and tobacco." The caseworker testified that Kristina appeared to be doing well in her current placement, that she was able to follow their rules, and that she communicated openly with her foster parents. The caseworker had no concerns about Kristina's placement. The caseworker indicated that efforts provided by the Department toward reunification included intensive family preservation (IFP) services, family team meetings, visits to the foster home, meetings between the caseworker and Kristina and the caseworker and Benjamin, and the provision of independent living skills management to Kristina. She indicated that the Department's efforts at reunification had not been successful and that progression had been difficult due to the lack of a recommendation from a therapist that it would be safe to progress to supervised visitation. She testified that the proposed guardianship would

meet Kristina's needs in a safe and appropriate environment and that the current foster parents were appropriate and suitable persons to serve as Kristina's guardians.

During cross-examination by Benjamin's attorney, the caseworker testified that other than a recent incident where she was unable to contact Benjamin by telephone, she had no problems contacting him. She testified that Benjamin completed IFP and did the things that were being asked of him, but that the discharge was "not successful." When asked to clarify, she testified, "One of the concerns that the IFP had was the relationship between [Benjamin] and Kristina." She described the typical IFP process which concludes within 60 days and usually includes sessions with the parent and child together in one setting. In this case, Kristina participated in individual sessions, but the IFP worker never did sessions where Benjamin and Kristina were both present. The caseworker later testified that the only IFP discharge recommendation she recalled Benjamin not following through on was the recommendation of a psychological evaluation for Kristina's sister, which Benjamin did not want. According to the caseworker, Benjamin was compliant with family support and did the things that family support asked him to do. He also attended and participated in team meetings, and the caseworker did not recall any concerns with his behavior in that setting. She met with Benjamin in his home on a monthly basis during the course of this case, and she indicated that his home was appropriate for children and that she had no safety concerns. After these meetings, the caseworker had no concerns about Benjamin's ability to provide the basic care and necessities for a child. However, she did express concern that when Benjamin disagrees with her, "he's very verbally aggressive, and he cusses, and he does not respond appropriately to [her]." Although the caseworker had never observed Kristina and Benjamin together, she expressed concern that he would respond inappropriately to things Kristina might say based on his inability to "maintain his professionalism" when meeting with the caseworker.

The current foster mother resides with her husband, her four children, her father, and Kristina. She testified that Kristina has "done really good" in the home. She was asked about her observations of Kristina after sessions with Patitz, and she testified that Kristina would be withdrawn and moody after the sessions and would usually "be sick, [with] vomiting, [and] headaches" for 2-3 days. The foster mother testified to her willingness to accept guardianship of Kristina and stated that she and her husband were willing and able to provide the necessary and appropriate supervision and decisionmaking authority for Kristina should they be appointed as guardians.

On August 24, 2018, the juvenile court entered an order granting the petition for guardianship and denying Benjamin's motion for supervised visitation. The court found clear and convincing evidence that the proposed guardianship was in Kristina' best interests and that her current foster parents were suitable individuals to be appointed as Kristina's coguardians. The court also found that the current order of visitation was in Kristina's best interests and overruled Benjamin's objection to it. The court again determined that any contact between Benjamin and Kristina should occur in a therapeutic setting "if/when therapeutic visits are renewed at the direction of a licensed therapist." Benjamin subsequently perfected his appeal to this court.

ASSIGNMENTS OF ERROR

Benjamin asserts that the juvenile court erred in (1) finding clear and convincing evidence that a guardianship was in Kristina's best interests and (2) denying his motion for supervised visitation and ordering that any contact between him and Kristina be in a therapeutic setting.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Reality W.*, 302 Neb. 878, 925 N.W.2d 355 (2019). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

ANALYSIS

*Guardianship.*

Benjamin asserts that the juvenile court erred in finding clear and convincing evidence that a guardianship was in Kristina's best interests. He argues he attempted to follow the Department's case plans to the best of his ability, that his reunification attempts were impeded by the therapists, and that he has not been given an opportunity to parent Kristina. He also argues that there was nothing on the record to show that he was unfit as a parent and that without an affirmative finding of unfitness, a guardianship should not have been granted. We conclude that the juvenile court's finding that the guardianship was in Kristina's best interests was an implicit finding that the parental preference presumption afforded to Benjamin had been rebutted. In our de novo review, we find that the evidence clearly and convincingly shows that at the time of trial, Benjamin was incapable of meeting Kristina's emotional needs and that reunification between them would be detrimental to her well-being. We agree that the parental preference presumption was rebutted and that it was in Kristina's best interests to grant the guardianship.

The parental preference principle applies in guardianship proceedings that affect child custody. *In re Guardianship of Elizabeth H.*, 17 Neb. App. 752, 771 N.W.2d 185 (2009). Under the principle of parental preference, a court may not properly deprive a biological or adoptive parent of the custody of the minor child unless it is affirmatively shown that such parent is unfit to perform the duties imposed by the relationship or has forfeited that right. *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238 (2004).

The parental preference principle establishes a rebuttable presumption that the best interests of a child are served by reuniting the child with his or her parent. *In re Guardianship of Jordan M.*, 20 Neb. App. 172, 820 N.W.2d 654 (2012). Under the parental preference principle, a parent's natural right to the custody of his or her child trumps the interests of strangers, including the State, to the parent-child relationship and the preferences of the child. *In re Interest of Jaydon W. & Ethan W.*, 25 Neb. App. 562, 909 N.W.2d 385 (2018). Therefore, unless it has been affirmatively shown that a biological or adoptive parent is unfit or has forfeited his or her right to custody, the U.S. Constitution and sound public policy protect a parent's right to custody of his or her child. *In re Interest of Jaydon W. & Ethan W., supra*. Absent circumstances which justify

terminating a parent's constitutionally protected right to care for his or her child, due regard for the right requires that a biological or adoptive parent be presumptively regarded as the proper guardian for his or her child. *Id.*

The Nebraska Supreme Court has held that an individual who opposes the termination of a guardianship bears the burden of proving by clear and convincing evidence that the biological or adoptive parent either is unfit or has forfeited his or her right to custody. *In re Interest of Lakota Z. & Jacob H.*, 282 Neb. 584, 804 N.W.2d 174 (2011). Absent such proof, the constitutional dimensions of the relationship between parent and child require termination of the guardianship and reunification with the parent. *Id.*

In *In re Guardianship of Elizabeth H., supra*, this court considered the application of the parental preference principle to the initial appointment of a guardian as opposed to a guardianship termination proceeding and held that the parental preference principle must also be applied to initially determine whether to appoint a guardian over a parent's objection. We stated that an individual who seeks appointment as a guardian over the objection of a biological or adoptive parent bears the burden of proving by clear and convincing evidence that the biological or adoptive parent is unfit or has forfeited his or her right to custody. *Id.* Absent such proof, the constitutional dimensions of the relationship between parent and child require a court to deny the request for a guardianship. *Id.* See, also, *In re Guardianship of Jordan M., supra* (subsequently applying same principle).

Although the guardianships in *In re Guardianship of Elizabeth H.* and *In re Guardianship of Jordan M.* arose under the Nebraska Probate Code, the Nebraska Supreme Court has held that the parental preference principle is equally applicable in a case where the children were adjudicated and under the jurisdiction of a juvenile court. See *In re Interest of Lakota Z. & Jacob H., supra*. In that case, the Supreme Court found that even if the appellants were correct in arguing that the best interests standard associated with juvenile adjudication somehow trumped the well-established law regarding the termination of a guardianship, the parental preference principle is still applicable, even to an adjudicated juvenile. The court stated that even when children are adjudicated and under the jurisdiction of a juvenile court, the Due Process Clause of the U.S. Constitution demands some showing of parental unfitness if parents are to be deprived of their interest in the care, custody, and control of their children. *In re Interest of Lakota Z. & Jacob H., supra*.

In the present case, the juvenile court did not specifically discuss the parental preference principle in its order or make an explicit finding that Benjamin was unfit or had forfeited his right to custody of Kristina. However, our de novo review of the record supports a finding of unfitness, as that term has been defined in case law. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing or which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Lakota Z. & Jacob H., supra*. Evidence of unfitness should be focused upon a parent's ability to care for a child, and not any other moral failings a parent may have. *Id.*; *State on behalf of Lilliana L. v. Hugo C.*, 26 Neb. App. 923, 924 N.W.2d 743 (2019). Evidence of a parent's past failings is pertinent only insofar as it suggests present or future faults. *Id.* Parental rights may be forfeited by substantial, continuous, and repeated neglect of a child and a failure to

discharge the duties of parental care and protection. *Windham v. Griffin*, 295 Neb. 279, 887 N.W.2d 710 (2016).

Clearly, there were deficiencies in Benjamin's parenting ability at the time Kristina and her sister were removed from his care. He had an altercation with Kristina that led to felony criminal charges and, after a plea deal, resulted in a misdemeanor assault conviction. Benjamin was on probation at the time of trial and was facing revocation of his probation due to another pending assault charge. However, the circumstances of that charge are not revealed by the record in this case, and Benjamin's probation had not yet been revoked at the time of the guardianship trial. Kristina's sister was quickly returned to Benjamin's care after her removal and has remained in his care. The record does not reveal any other information about his care of or relationship with this child. The caseworker found Benjamin's home to be appropriate and safe for children and she had no concerns about Benjamin's ability to provide the basic care and necessities for a child. Benjamin has been attending individual therapy and has generally done everything that the Department has asked of him in pursuing reunification.

The problem in this case is not Benjamin's ability to provide for Kristina's physical needs, but rather, his present inability to provide for her emotional and mental health needs. Clearly, the relationship between Benjamin and Kristina was severely strained. While the difficulty between them may not be completely Benjamin's fault and it appears Kristina has emotional issues that have caused her to lash out at her father, the fact remains that reunification at this time would be detrimental to Kristina's well-being. Kristina does not trust Benjamin, and the two attempted rounds of therapeutic visitation in this case did not go well. Patitz recommended that additional individual therapy for both Kristina and Benjamin was necessary before any further attempts at therapeutic visitation, and she did not feel that Benjamin was currently equipped to care for Kristina's emotional needs.

The record before us supports a determination that, at the time of the guardianship hearing, Benjamin was incapable of providing for Kristina's emotional needs and that reunification would be detrimental to Kristina's well-being. In reaching this conclusion, we emphasize that we do not find Benjamin to have personal deficiencies that make him incapable of parenting in general, but rather only as it relates to Kristina's current emotional needs, which further therapy will hopefully improve. Further, the guardianship is only a temporary custody arrangement established for Kristina's well-being and does not sever Benjamin's parental rights; rather it enables him to take the necessary steps to resume custody of Kristina in the future. See *In re Guardianship of D.J., supra*.

*Visitation.*

Benjamin asserts that the juvenile court erred in denying his motion for supervised visitation and ordering that any contact between him and Kristina be in a therapeutic setting. He argues that therapeutic visitation in this case was stopped in part because of Kristina's unwillingness to continue and that while evidence was presented that she exhibited certain symptoms following these visits, this information was derived from Kristina's statements to therapists and the current foster mother's testimony and was not otherwise corroborated. He notes that both Lieske and Patitz were unwilling to continue therapeutic sessions and argues that the

difficulty of finding another service provider makes it nearly impossible for him to resume contact with Kristina.

The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests, and the code must be construed to assure the rights of all juveniles to care and protection. *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012). And, as we have stated in the context of paternity and divorce cases, the best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019). See, also, *Conn v. Conn*, 15 Neb. App. 77, 722 N.W.2d 507 (2006) (parent's rights are not absolute and must yield to best interests of child). Here there was evidence that therapeutic visitation efforts had not led to a successful progression to visitation outside of a therapeutic setting and that Kristina suffered ill effects following the therapeutic contact. There is a recommendation that Benjamin and Kristina work further on individual issues before resuming attempts at contact in a therapeutic setting. Kristina and Benjamin have not had contact outside of a therapeutic setting since her removal from his care and clearly have a very strained relationship. The evidence supports the juvenile court's denial of Benjamin's motion for supervised visitation and its determination that any contact occur in a therapeutic session.

## CONCLUSION

The juvenile court did not err in granting the petition for guardianship or in denying Benjamin's motion for supervised visitation.

AFFIRMED.